**Sort Date Entries: Descending Ascending**

**Display Options:** All Entries ▾

```
EXHIBIT
A
```

**04/09/2025**

**Filing Info Sheet eFiling**

    **Filed By:** GAYLIN RICH CARVER

**Note to Clerk eFiling**

    **Filed By:** GAYLIN RICH CARVER

**Confid Filing Info Sheet Filed**

Confidential Filing Information Sheet.

    **Filed By:** GAYLIN RICH CARVER

    **On Behalf Of:** NICOLE JENAE ELLIOTT

**Exhibit Filed**

Exhibit D.

    **Filed By:** GAYLIN RICH CARVER

    **On Behalf Of:** NICOLE JENAE ELLIOTT

**CRIFS/Unredacted Document**

Exhibit C in associated to Exhibit filed on 04/09/2025.

    **Filed By:** GAYLIN RICH CARVER

    **On Behalf Of:** NICOLE JENAE ELLIOTT

    **Associated Entries:** 04/09/2025 -

**Exhibit Filed**

    **+**

**Exhibit Filed**

Exhibit C - REDACTED.

    **Filed By:** GAYLIN RICH CARVER

    **On Behalf Of:** NICOLE JENAE ELLIOTT

    **Associated Entries:** 04/09/2025 - CRIFS/Unredacted Document  +

**Exhibit Filed**

Exhibit B.

    **Filed By:** GAYLIN RICH CARVER

    **On Behalf Of:** NICOLE JENAE ELLIOTT

**CRIFS/Unredacted Document**

Exhibit A in associated to Exhibit filed on 04/09/2025.

    **Filed By:** GAYLIN RICH CARVER

    **On Behalf Of:** NICOLE JENAE ELLIOTT

    **Associated Entries:** 04/09/2025 -

**Exhibit Filed**

    **+**

**Exhibit Filed**

Exhibit A - REDACTED.

    **Filed By:** GAYLIN RICH CARVER

    **On Behalf Of:** NICOLE JENAE ELLIOTT

    **Associated Entries:** 04/09/2025 - CRIFS/Unredacted Document  +

**Pet Filed in Circuit Ct**

Petition for Injunction, Restraining Order and Preliminary Injunction.

    **Filed By:** GAYLIN RICH CARVER

    **On Behalf Of:** NICOLE JENAE ELLIOTT

IN THE CIRCUIT COURT OF CALLAWAY COUNTY, MISSOURI

NICOLE JENAE ELLIOTT,                          )
                                               )
                    Petitioner,                )
                                               )
                                               )     Case No.: _____
                                               )
v.                                             )
                                               )
WILLIAM WOODS UNIVERSITY                       )
1 University Ave.                              )
Fulton, MO 65251-2388                          )
                                               )
                    Respondent,                )
                                               )
        And                                    )
                                               )
U.S. DEPARTMENT OF THE TREASURY,               )
P.O. Box 979101                                )
St. Louis, MO 63197-9000                       )
                                               )
                    Respondent,                )
                                               )
        And                                    )
                                               )
SMALL BUSINESS ADMINISTRATION                  )
409 3rd Street, SW                             )
Washington, DC 20416                           )
                                               )
                    Respondent.                )
                                               )

## PETITION FOR INJUNCTION, RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Comes Now, Petitioner, Nicole J. Elliott, personally and by and through counsel, Gaylin

Carver, and for her petition for restraining order, preliminary injunction and permanent

injunction states as follows:

1. Petitioner, Nicole Elliott, is an individual who resides in Callaway County at the

    address filed with this case.

2. Respondent, William Woods University, is a duly recognized entity that is located in Callaway County and is the employer of Petitioner, Nicole J. Elliott and can be served at the address listed above.

3. Respondent, U.S. Department of the Treasury, is part of the U.S government and can be served via certified mail at the address listed above.

4. Respondent, Small Business Administration, is an governmental entity that can be served via certified mail at the address listed above.

5. On or about March 28th Wage Garnishment Order was issued by Respondent U.S. Dept. of Treas. To be served upon William Woods University. A copy of which is attached hereto as Ex. A.

6. Prior to said Garnishment Order, Petitioner received notice from the Bureau of Fiscal Services regarding the potential of Wage Garnishment being issued against her by the Small Business Administration, that included a form to request a hearing or eligibility determination. A copy of which is attached hereto as Ex. B.

7. Petitioner did complete the form as requested and sent all the accompanying documents with the form in order to show how and why she did not owe the debt listed in the notice. A copy of the documents sent with the hearing request form are attached hereto as Ex. C

8. Petitioner's former spouse, Michael Mullett, plead guilty and was convicted of more than 20 counts of fraud, forgery, stealing and other related felony crimes in the Circuit Court of Callaway County, case #23CW-CR01239-01.

9. One of the charges for which Michael Mullett was convicted included the forging of Petitioner's signature on a Small Business Administration (hereinafter SBA) Loan that was serviced through Bank of Missouri located in Callaway County.

10. Pursuant to the divorce decree entered in Nicole Elliott v. Michael Mullett, Callaway County Case #23CW-FC00490, Michael Mullett was ordered to be solely responsible for any debt associated with Callaway County Case 23CW-CR01239-01.

11. Pursuant to the criminal case referenced in paragraph 8 above, during its pendency, all assets of Michael Mullett's were seized by Bank of Missouri and sole to pay towards debt owed to said entity, including the SBA loan that is the subject of the wage garnishment issued to Respondent, William Woods University.

12. A portion of the debt owed on the SBA loan has been satisfied. A copy of those documents are attached hereto as Exhibit D.

<u>TEMPORARY RESTRAINING ORDER</u>

Comes Now, Petitioner and hereby requests this Court issue a temporary restraining order against Respondent William Woods University retraining said entity from executing the wage garnishment order against Petitioner Nicole Elliott and in support thereof states:

13. Petitioner incorporates and restates paragraphs 1 through 12 above, as if fully restated herein.

14. Without said temporary restraining order, the petition will suffer irreparable harm in that her wages will be withheld and the funds unrecoverable and she is in need of her full income to support herself and her child.

15. The Temporary restraining order will preserve the status quo.

WHEREFORE, Petitioner prays this court issue temporary restraining order directed to William Woods University prohibiting said entity from enforcing the Wage Garnishment document they received on April 7, 2025 and further order as the Court deems just and reasonable.

<u>TEMPORARY AND PERMANANT INJUNCTION</u>

Comes now, Petitioner and hereby request this Court issue Temporary Injunction against the Respondents U.S. Dept. of Treasury and Small Business Administration prohibiting both entities from garnishing, collecting, or otherwise taking funds from Petitioner and eventually Permanent Injunction and in support thereof states as follows:

16. Petitioner incorporates and restates paragraphs 1 through 15 above, as if fully restated herein.

17. The U.S. Department of Treasury began the Wage Garnishment process without allowing Petitioner the hearing per the request that was sent to them as evidenced by Ex. C.

18. Petitioner is not liable for any debt that was taken by Michael Mullett through SBA loan in that petitioner's name was forged, as evidence by the criminal case referenced above.

19. Irreparable harm will come to Petitioner if this Court does not issue a temporary injunction in that funds needed to support herself and her child will be taken from her income, and it will be impossible to receive the funds back.

20. The Respondents, U.S. Dept. of Treasury and SBA did not exhaust all administrative remedies allowed to Petitioner in that they have not held a hearing as requested to by the Petitioner such that she could explain and present documentation as to why she is not liable for said debt.

WHEREFORE, Petitioner prays this Court issue temporary injunction against Respondents U.S. Dept. of Treasury and SBA as stated above and eventually issue permanent injunction as stated above and further order as the Court deems just and appropriate under the circumstances.

Respectfully submitted,

CARVER & MICHAEL, LLC

Gaylin R. Carver, # 51131
419 East High Street
Jefferson City, Missouri 65101
Telephone: (573) 636-4215
Facsimile: (573) 634-3008
gaylin@carvermichael.net

ATTORNEY FOR PETITIONER

STATE OF MISSOURI )
                     ) ss.
COUNTY OF COLE )

        I certify under penalty of perjury that the above statement is complete, true and accurate to the best of my knowledge and belief. I am aware of the criminal penalties for perjury and false affidavit under RSMo. §575.040, §575.050 and §575.060, which provide for imprisonment for up to five years and a fine up to $5,000.

*Nicole Jenae Elliott*
Nicole Jenae Elliott (Apr 9, 2025 10:07 CDT)
NICOLE JENAE ELLIOTT

Subscribed and sworn to before me, a notary public, this 9th day of April 2025.

_____
Notary Public

My commission expires:

JOANNA DUPUIS
Notary Public - Notary Seal
State of Missouri
Commissioned for Cole County
My Commission Expires: June 26, 2028
Commission Number: 12959849

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM

DEPARTMENT OF THE TREASURY
BUREAU OF THE FISCAL SERVICE
P.O. BOX 830794
BIRMINGHAM, AL 35283-0794

Please see Box #21 for check payments mailing address. Above address for correspondence only.

March 31, 2025

WILLIAM WOODS UNIVERSITY
1 UNIVERSITY AVE
FULTON MO 65251-2388

Nicole J Elliott
XXX-XX-

Dear Sir or Madam:

Enclosed please find an administrative Wage Garnishment Order issued by the U.S. Department of the Treasury for the above-named employee. The Order is effective immediately.

Please fax the AWG Employment Certification to the following number in accordance with the employment status.

If currently employed fax to 855-837-2988
If NOT currently employed fax to 855-834-2856

If you have any questions regarding the Order, please contact an AWG Analyst at (888) 826-3127. Hearing impaired persons may use the Federal Relay Service by dialing (800) 877-8339 to reach a Communications Assistant, who will dial the toll-free number for you. Thank you for your cooperation.

U.S. Department of the Treasury
Bureau of the Fiscal Service

AWGLWGO300A fdv1          0000000139L47427943  LWGO0001394601 122

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM

# UNITED STATES GOVERNMENT
## WAGE GARNISHMENT ORDER (SF-329B)

☐ If box checked, this is an Amended Order. An Amended Order supersedes any prior orders issued by the Creditor Agency in connection with the employee named below.

| 1. Date of this Order:<br>March 28, 2025 | 2. Date Mailed to Employer:<br>March 28, 2025 | 3. Creditor Agency Tracking No.<br>(refer to this number in all correspondence):<br>WG2695155 |
|---|---|---|

**RE:**

| 4.a. Employee Name:<br>Nicole J Elliott<br>4.b. Employee Alias Name:<br>Nicole J Elliott | 5. Employee Social Security No.:<br>XXX-XX- |
|---|---|

**TO:**

| 6. Employer:<br>WILLIAM WOODS UNIVERSITY | 7. Employer Mailing Address<br>(include street address, p.o. box, suite no., city, state, zip code):<br>1 UNIVERSITY AVE<br>FULTON MO 65251-2388 |
|---|---|

**FROM:**

| 8. Creditor Agency:<br>U.S. Department of the Treasury,<br>Acting On Behalf Of:<br>Small Business Administration<br>Small Business Administration | 9. Check Payment Mailing Address:<br>U.S. Department of the Treasury<br>Post Office Box 979101<br>St. Louis, MO 63197-9000<br><br>(See Box #21 below for the mailing address for check payments.) |
|---|---|
| 10. Contact Name:<br>AWG Analyst | 11. Telephone No.:<br>(888) 826-3127 |
| 12. Internet e-mail address:<br>AWGQuestions@fiscal.treasury.gov | 13. Fax No.:<br>Currently Employed 855-837-2988<br>NOT Currently Employed 855-834-2856 |

| 14. Amount Due:<br>$ 102,398.02 | 15. As of (Month/Day/Year):<br>March 28, 2025 | *Note:* The amount due may be increased as a result of additional interest, penalties, and other costs being assessed by the Creditor Agency. |
|---|---|---|

**Section 1. ORDER**. YOU, the Employer, are hereby ORDERED to deduct from all disposable pay paid by you to the Employee the Wage Garnishment Amount described in Section 2 of this Order. You are ordered to begin deductions on the first pay day after you receive this Order. If the first pay day is within 10 days after you receive this Order, you may begin deductions on the second pay day after you receive this Order. You are ordered to continue deductions until you receive notification from the Creditor Agency to suspend or discontinue deductions. YOU are further ORDERED to pay the Creditor Agency all Wage Garnishment Amounts deducted by you under

\* \* \* \* \*

*Notice to Federal Agencies: Complete instructions to Federal Agencies preparing Administrative Wage Garnishment forms may be obtained from the Fiscal Service web site at:*
*https://fiscal.treasury.gov/fsservices/gov/debtColl/rsrcsTools/debt_forms.htm#awg*
AUTHORIZED FOR LOCAL REPRODUCTION
PREVIOUS EDITION NOT USABLE
**STANDARD FORM 329B** (rev. 1/2005) Prescribed by 31 CFR 285.11



000233-3-5<br>00002133

this order within three (3) business days of the withholding. Employers are encouraged to make payments electronically, if possible, as follows:

| 16. ABA Routing No.: N/A | 17. Account No.: | 18. Agency Location Code (ALC) No.: |
|---|---|---|
| 19. Account Title: | 20. Other Information Required (i.e., tracking no., debtor name, etc.): WG2695155 | |

Otherwise, mail checks (postmarked with 3 business days of the withholding) to:

| 21. Check Payment Mailing Address: |
|---|
| U.S. Department of the Treasury |
| Post Office Box 979101 |
| St. Louis, MO 63197-9000 |

## Section 2. WAGE GARNISHMENT AMOUNT.

(a) The Wage Garnishment Amount is $ _____ per pay period in accordance with an agreement between the Creditor Agency and the Employee.

-OR-

(b) The Wage Garnishment Amount for each pay period is the lesser of:

(1) 15 % of the Employee's disposal pay *(not to exceed 15%)*;

(2) the garnishment amount set forth in 15 U.S.C. 1673(a)(2) (the amount by which the employee's disposable pay exceeds an amount equivalent to 30 times the minimum wage); or

(3) 25% of the Employee's disposable pay less the amounts withheld under the withholding orders with priority. A withholding order with priority is a valid, legally enforceable withholding order that either (1) was received by the Employer prior to this Order, or (2) is an order for family support regardless of date received. Upon termination of any withholding order with priority or upon receipt of an order for family support subsequent to the receipt of this Order, the amount withheld for this order shall be recalculated based on the formula described in this Section 2(b).

*Note*: **The Employer may use the attached Wage Garnishment Worksheet to calculate the Wage Garnishment Amount.**

**CREDITOR AGENCY CERTIFICATION.** The **CREDITOR AGENCY** hereby **certifies** that this Order is issued in accordance with the requirements of 31 U.S.C. § 3720D and 31 C.F.R. § 285.11 and is mailed to the Employer on the date shown above.

_____
CREDITOR AGENCY SIGNATURE

Title: ___Director_____

Print Name: __Keith Alderson_____

AWGLWGO300A fdv1     0000000139L47427943   LWGO0001394601 122
**STANDARD FORM 329B BACK** (rev. 1/2005)

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM

# Carver Michael

419 East High Street          www.carvermichael.net          573-636-4215 (telephone)
Jefferson City, MO 65101                                      573-634-3008 (facsimile)

Gaylin Rich Carver                                           Sara C. Michael

March 4, 2025

**EXHIBIT B**

Via Email: AWFhearingrequest@fiscal.treasury.gov

Bureau of the Fiscal Service
Attn: AWG Analyst
P.O. Box 830794
Birmingham, AL 35283-0794

    Re:    Hearing Request Case Number L47427943

To whom it may concern:

    Please find included with this letter a request for hearing on behalf of my client Nicole Elliott. Please direct all communications to my law office at the address above, including the hearing date once set.

    Also find enclosed with this letter the following documents:

1. Judgment of Dissolution;

2. Complaint filed by the Callaway County Prosecuting Attorney's office against Michael Mullett wherein he was charged with forgery, one of the counts relates specifically to this particular loan;

3. The order of probation of Michael Mullett wherein he is ordered as part of his probation to pay restitution that includes this particular loan that he incurred by forging my client's signature.

    Thank you in advance for your assistance with this matter.

             Sincerely,

             CARVER & MICHAEL, LLC

             Gaylin Rich Carver
             gaylin@carvermichael.net

GRC/jd
cc: Nicole Elliott

## Administrative Wage Garnishment Request for Hearing or Eligibility Determination

**MAIL OR FAX FORM TO:**
FAX: (855) 292-9623
EMAIL: AWGhearingrequest@fiscal.treasury.gov
MAIL: Bureau of the Fiscal Service
Attn: AWG Analyst
Post Office Box 830794
Birmingham, AL 35283-0794



Date Notice of Intent Sent: February 26, 2025

| Debtor Name | Nicole J Elliott |
| --- | --- |
| Treasury Case Number | L47427943 |
| Agency Name | Small Business Administration |
| Agency Account Number | 8868978207 |
| Account Balance | $101,655.97 |

**If you object to garnishment of your wages for the debt mentioned above, you can use this form to request a hearing or to assert ineligibility for garnishment based on the facts of your employment. Please check the appropriate box(es) below. Your request for a hearing or assertion of ineligibility must be in writing, signed, and delivered to the address above. EXPLAIN any additional facts concerning your objection on a separate sheet of paper and, together with all supporting documentation, enclose it with this request. Your objection(s) will be considered based on the information and documents you provide with this form, and any records held by the agency.**

| | |
| --- | --- |
| I request a hearing based on the existence of the debt - I do not owe the debt. | ☒ |
| I request a hearing based on the amount of the debt - I do not owe the full amount of the debt. | ☐ |
| I request a hearing based on the garnishment amount - Proposed garnishment would cause financial hardship.<br><br>**NOTE: You must provide a signed financial statement along with copies of earnings and income records and proof of expenses. To obtain a copy of the financial statement form, go to https://www.fiscal.treasury.gov/files/cross-servicing/consumer-finstmt.pdf and fax it to the number listed above.** | ☐ |
| I am ineligible for garnishment because I was involuntarily terminated from my last employment, and I have been employed in my current job less than 12 months.<br><br>**NOTE: You must attach documentation from your employer showing the date you were hired in your current job and documentation from prior employer showing involuntary termination for this exemption to be considered.** | ☒ |

| Debtor Address | |
| --- | --- |
| Debtor Phone No. / Email | (Phone)          (Email) |
| Employer Name and Address | |
| Employer Phone Number | |

**I have read and understand the Important Notice Concerning Administrative Wage Garnishment enclosed with this form.**

I understand that if I make or provide any knowingly false or frivolous claims or statements, representations, or evidence to a Federal Agency, I may be subject to penalties under the False Claims Act, 31 U.S.C. 3729-3731 or criminal penalties under 18 U.S.C. 286,287, 1001, and 1002.

Signature _____ Date 3-4-2025

Attorney for Nicole Elliott - Gaylin Carver #51131

AWGNLD 130 fdv 000000004T1L47427943 NLD 0004114600 121

**IN THE CIRCUIT COURT OF CALLAWAY COUNTY, MISSOURI**

OCN:
STATE OF MISSOURI,                    )
           PLAINTIFF,          )       # EXHIBIT C
                        )
     VS.                              )    CASE NO:
                        )
MICHAEL STORM MULLETT                  )
                        )    WARRANT REQUEST
                        )
321 Meadowlark Lane                    )
Fulton, MO 65251                       )    PA FILE NO: 027098883
     DEFENDANT.                        )

## COMPLAINT

Comes now, the Prosecuting Attorney of the County of Callaway, State of Missouri, and states upon information and belief that there is probable cause to believe that on or about the date or dates below noted, the accused committed the following offense or offenses as part of the same transaction or occurrence or as part of the same common scheme or plan:

### COUNT I

The defendant, in violation of Section 570.090.1(1), RSMo, committed the class D felony of forgery, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or about May 13, 2021, in the County of Callaway, State of Missouri, the defendant, with the purpose to defraud, made a writing, namely the signature of Nicole Elliott on a document submitted to the Missouri Secretary of State and related to the ownership of Ammo Bum, so that it purported to have been made by authority of one who did not give such authority.
Missouri Charge Code: 570.090-001Y20202589.0

### COUNT II

The defendant, in violation of Section 570.090.1(1), RSMo, committed the class D felony of forgery, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or about June 14, 2022, in the County of Callaway, State of Missouri, the defendant, with the purpose to defraud, made a writing, namely the signature of Nicole Elliott on a document related to the ownership of MO Arms LLC, so that it purported to have been made by authority of one who did not give such authority.
Missouri Charge Code: 570.090-001Y20202589.0

### COUNT III

The defendant, in violation of Section 570.090.1(1), RSMo, committed the class D felony of forgery, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or about September 11, 2023, in the County of Callaway, State of Missouri, the defendant, with the purpose to defraud, made a writing, namely the signature of Nicole Elliott on a document related to the ownership of Wild Nation LLC, so that it purported to have been made by authority of one who did not give such authority.
Missouri Charge Code: 570.090-001Y20202589.0

### COUNT IV

The defendant, in violation of Section 570.090.1(1), RSMo, committed the class D felony of forgery, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or between April 1, 2022 and August 31, 2023, in the County of Callaway, State of Missouri, the defendant, with the purpose to defraud, authenticated a writing, namely an online auction account in

the name of Nic Elliott with an email of auctionbummo@gmail.com, so that it purported to have been made by authority of one who did not give such authority.
Missouri Charge Code: 570.090-001Y20202589.0

## COUNT V

The defendant, in violation of Section 570.090.1(1), RSMo, committed the class D felony of forgery, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or between April 1, 2022 and August 31, 2023, in the County of Callaway, State of Missouri, the defendant, with the purpose to defraud, authenticated a writing, namely an online auction account in the name of Janae Elliott with an email of msmullett@outlook.com, so that it purported to have been made by authority of one who did not give such authority.
Missouri Charge Code: 570.090-001Y20202589.0

## COUNT VI

The defendant, in violation of Section 570.090.1(1), RSMo, committed the class D felony of forgery, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or between April 1, 2022 and August 31, 2023, in the County of Callaway, State of Missouri, the defendant, with the purpose to defraud, authenticated a writing, namely an online auction account in the name of Janae Elliott with an email of nje1389@gmail.com so that it purported to have been made by authority of one who did not give such authority.
Missouri Charge Code: 570.090-001Y20202589.0

## COUNT VII

The defendant, in violation of Section 570.090.1(1), RSMo, committed the class D felony of forgery, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or about March 7, 2022, in the County of Callaway, State of Missouri, the defendant, with the purpose to defraud, made a writing, namely a signature of Nicole Elliott on a lease agreement, so that it purported to have been made by authority of one who did not give such authority.
Missouri Charge Code: 570.090-001Y20202589.0

## COUNT VIII

The defendant, in violation of Section 570.090.1(4), RSMo, committed the class D felony of forgery, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or about April 29, 2022, in the County of Callaway, State of Missouri, the defendant, with the purpose to defraud, used as genuine a writing, namely a credit application for Buck Knives, knowing that it had been made so that it purported to have been made by authority of one who did not give such authority.
Missouri Charge Code: 570.090-001Y20202589.0

## COUNT IX

The defendant, in violation of Section 570.090.1(1), RSMo, committed the class D felony of forgery, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or about March 8, 2022, in the County of Callaway, State of Missouri, the defendant, with the purpose to defraud, made a writing, namely the signature of Nicole Elliott on a document related to a loan modification request in the amount of $97,600.00, so that the signature purported to have been made by authority of one who did not give such authority.
Missouri Charge Code: 570.090-001Y20202589.0

## COUNT X

The defendant, in violation of Section 570.090.1(1), RSMo, committed the class D felony of forgery, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or about May 17, 2023, in the County of Callaway, State of Missouri, the defendant, with the purpose to defraud, made a writing, namely the signature of Nicole Elliott on IRS Form 8879 so that it purported to have been made by authority of one who did not give such authority.
Missouri Charge Code: 570.090-001Y20202589.0

## COUNT XI

The defendant, in violation of Section 570.090.1(1), RSMo, committed the class D felony of forgery, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or about September 21, 2023 in the County of Callaway, State of Missouri, the defendant, with the purpose to defraud, made a writing, namely the signature of Nicole Elliott on a document related to a Clover account, so that the signature purported to have been made by authority of one who did not give such authority.
Missouri Charge Code: 570.090-001Y20202589.0

## COUNT XII

The defendant, in violation of Section 570.130, RSMo, committed the class A misdemeanor of fraudulent use of a credit device, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or between January 1, 2023, and October 6, 2023, in the in the County of Callaway, State of Missouri, the defendant used a credit device, namely a Chase credit card in the name of Nicole Mullett, for the purpose of obtaining property and/or services, knowing that defendant's use of the device was unauthorized.
Missouri Charge Code: 570.130-002Y20202605.0

## COUNT XIII

The defendant, in violation of Section 570.130, RSMo, committed the class A misdemeanor of fraudulent use of a credit device, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or between January 1, 2023, and October 6, 2023, in the in the County of Callaway, State of Missouri, the defendant used a credit device, namely a Discovery Bank credit card in the name of Nicole Mullett, for the purpose of obtaining property and/or services, knowing that defendant's use of the device was unauthorized.
Missouri Charge Code: 570.130-002Y20202605.0

## COUNT XIV

The defendant, in violation of Section 570.223, committed the class D felony of identity theft, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or between January 1, 2023 and January 31, 2023, in the County of Callaway, State of Missouri, the defendant knowingly, with the intent to deceive or defraud, used the name of Nicole Mullett, a means of identification not lawfully issued for defendant's use to apply for a Chase credit card and that resulted in the theft of credit in excess of $750.00.
Missouri Charge Code: 570.223-003Y20202699.0

## COUNT XV

The defendant, in violation of Section 570.223, committed the class D felony of identity theft, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or between June 1, 2022, and June 30, 2022, in the County of Callaway, State of Missouri, the defendant knowingly, with the intent to deceive or defraud, used the name of Nicole Mullett, a means of identification, not lawfully issued for defendant's use to apply for a Discovery Bank credit card and that resulted in the theft of credit in excess of $750.00.
Missouri Charge Code: 570.223-003Y20202699.0

## COUNT XVI

The defendant, in violation of Section 570.223, committed the class B misdemeanor of identity theft, punishable upon conviction under Sections558.002 and 558.011, RSMo, in that on or about July 11, 2022, in the County of Callaway, State of Missouri, the defendant knowingly, with the intent to deceive or defraud, used the social security number of Nicole Mullett, a means of identification, not lawfully issued for defendant's use, in conjunction with obtaining an Employer Identification Number (EIN) for Nicole Mullett and MO Arms LLC.
Missouri Charge Code: 570.223-006Y20202699.0

## COUNT XVII

The defendant, in violation of Section 570.223, committed the class D felony of identity theft, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on October 4, 2021, in the County of Callaway, State of Missouri, the defendant knowingly, with the intent to deceive or defraud, used the name of Nicole Mullett, a means of identification not lawfully issued for defendant's use to apply for a loan for MO Arms LLC and that resulted in the theft of credit in excess of $750.00.
Missouri Charge Code: 570.223-003Y20202699.0

## COUNT XVIII

The defendant, in violation of Section 570.223, committed the class B misdemeanor of identity theft, punishable upon conviction under Sections558.002 and 558.011, RSMo, in that on or about December 9, 2022, in the County of Callaway, State of Missouri, the defendant knowingly, with the intent to deceive or defraud, used the social security number of Nicole Mullett, a means of identification, not lawfully issued for defendant's use, in conjunction with obtaining an Employer Identification Number (EIN) for Nicole Mullett and Warchest LLC.
Missouri Charge Code: 570.223-006Y20202699.0

## COUNT XIX

The defendant, in violation of Section 570.090.1(1), RSMo, committed the class D felony of forgery, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or about January 4, 2023, in the County of Callaway, State of Missouri, the defendant, with the purpose to defraud, authenticated a writing, namely a form submitted to the Missouri Secretary of State's Office in the name of Evelyn Faye, so that it purported to have been made by another.
Missouri Charge Code: 570.090-001Y20202589.0

## COUNT XX

The defendant, in violation of Section 570.090.1(1), RSMo, committed the class D felony of forgery, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or between April 22, 2022 and August 31, 2023, in the County of Callaway, State of Missouri, the defendant, with the purpose to defraud, authenticated a writing, namely an online auction account in the name of Evelyn Faye with an email of mloufitters510@gmail.com, so that it purported to have been made by another.
Missouri Charge Code: 570.090-001Y20202589.0

## COUNT XXI

The defendant, in violation of Section 570.090.1(1), RSMo, committed the class D felony of forgery, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or about June 27, 2023, in the County of Callaway, State of Missouri, the defendant, with the purpose to defraud, made a writing, namely a signature of Brady Gehring on a line of credit application with Non-Cash Electronic Transfer Inc. (Neptune Rising LLC), so that the signature purported to have been made by authority of one who did not give such authority.
Missouri Charge Code: 570.090-001Y20202589.0

## COUNT XXII

The defendant, in violation of Section 570.223, committed the class B misdemeanor of identity theft, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or about June 27, 2023, in the County of Callaway, State of Missouri, the defendant knowingly, with the intent to deceive or defraud, used the driver's license of Brady Gehring, a means of identification not lawfully issued for defendant's use, in conjunction with applying for a line of credit with Non-Cash Electronic Transfer, Inc.
Missouri Charge Code: 570.223-006Y20202699.0

## COUNT XXIII

The defendant, in violation of Section 570.223, committed the class B misdemeanor of identity theft, punishable upon conviction under Sections558.002 and 558.011, RSMo, in that on or about

December 9, 2022, in the County of Callaway, State of Missouri, the defendant knowingly, with the intent to deceive or defraud, used the social security number of Gary Adams, a means of identification not lawfully issued for defendant's use, in conjunction with obtaining an Employer Identification Number (EIN) for Gary Adams and Ironside Armory LLC.
Missouri Charge Code: 570.223-006Y20202699.0

## COUNT XXIV

The defendant, in violation of Section 571.063, RSMo, committed the class E felony of fraudulent purchase of a firearm, punishable upon conviction under Sections 558.011 and 558.002, RSMo, in that on or about February 24, 2023, in the County of Callaway, State of Missouri, the defendant knowingly provided a licensed dealer or private seller of firearms or ammunition materially false information with the intent to deceive the dealer or seller about the legality of a transfer of a firearm by creating an account on Hall Auction Online Gallery in the name of Jay Hos and purchasing a firearm in the name of Jacob Hoskins and providing a phone number and email address not associated with Jacob Hoskins.
Missouri Charge Code: 571.063-001Y20205299.0

## COUNT XXV

The defendant, in violation of Section 571.063, RSMo, committed the class E felony of fraudulent purchase of a firearm, punishable upon conviction under Sections 558.011 and 558.002, RSMo, in that on or about February 24, 2023, in the County of Callaway, State of Missouri, the defendant knowingly provided a licensed dealer or private seller of firearms or ammunition materially false information with the intent to deceive the dealer or seller about the legality of a transfer of a firearm by creating an account on Sharpless Auctions in the name of Jay Hos and purchasing a firearm in the name of Jacob Hoskins and providing a phone number and email address not associated with Jacob Hoskins.
Missouri Charge Code: 571.063-001Y20205299.0

## COUNT XXVI

The defendant, in violation of Section 571.063, RSMo, committed the class E felony of fraudulent purchase of a firearm, punishable upon conviction under Sections 558.011 and 558.002, RSMo, in that on or about March 4, 2023, in the County of Callaway, State of Missouri, the defendant knowingly provided a licensed dealer or private seller of firearms or ammunition materially false information with the intent to deceive the dealer or seller about the legality of a transfer of a firearm by creating an account on Fountain City Auction in the name of Jay Hos and purchasing a firearm in the name of Jacob Hoskins and providing a phone number and email address not associated with Jacob Hoskins.
Missouri Charge Code: 571.063-001Y20205299.0

## COUNT XXVII

The defendant, in violation of Section 570.090.1(1), RSMo, committed the class D felony of forgery, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or about July 9, 2022, in the County of Callaway, State of Missouri, the defendant, with the purpose to defraud, made a writing, namely the signature of Brian Schmidt on a document submitted to the Missouri Secretary of State and related to the ownership of Warchest LLC, so that the signature purported to have been made by authority of one who did not give such authority.
Missouri Charge Code: 570.090-001Y20202589.0

## COUNT XXVIII

The defendant, in violation of Section 570.090.1(1), RSMo, committed the class D felony of forgery, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or about July 9, 2022, in the County of Callaway, State of Missouri, the defendant, with the purpose to defraud, made a writing, namely the signature of Brian Schmidt on a document submitted to the Missouri Secretary of State and related to the ownership of Ironside Armory LLC, so that the signature purported to have been made by authority of one who did not give such authority.
Missouri Charge Code: 570.090-001Y20202589.0

## COUNT XXIX

The defendant, in violation of Section 570.090.1(1), RSMo, committed the class D felony of forgery, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or about July 9, 2022, in the County of Callaway, State of Missouri, the defendant, with the purpose to defraud, made a writing, namely the signature of Aaron Wisdom on a document submitted to the Missouri Secretary of State and related to the ownership of Neptune Rising LLC, so that the signature purported to have been made by authority of one who did not give such authority.
Missouri Charge Code: 570.090-001Y20202589.0

## COUNT XXX

The defendant, in violation of Section 570.030, RSMo, committed the class A misdemeanor of stealing by deceit, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or about December 18, 2021, in the County of Callaway, State of Missouri, the defendant appropriated United States Currency of a value of at least one hundred fifty dollars, which property was in the possession of Arturo Magdaleno, and defendant appropriated such property from Arturo Magdaleno and with the purpose to deprive Arturo Magdaleno thereof by deceit in that the defendant represented to Arturo Magdaleno that defendant would ship primers to Arturo Magdaleno in exchange for payment from Arturo Magdaleno of $527.65, which representation was false and known by defendant to be false and Arturo Magdaleno relied on the representation and was thereby induced to part with such property.
Missouri Charge Code: 570.030-043Y20202399.0

## COUNT XXXI

The defendant, in violation of Section 570.030, RSMo, committed the class A misdemeanor of stealing by deceit, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or about December 18, 2021, in the County of Callaway, State of Missouri, the defendant appropriated United States Currency of a value of at least one hundred fifty dollars, which property was in the possession of Peter Bankins, and defendant appropriated such property from Peter Bankins and with the purpose to deprive Peter Bankins thereof by deceit in that the defendant represented to Peter Bankins that defendant would ship to Peter Bankins a Ruger .22 in exchange for payment from Peter Bankins of $535.57 which representation was false and known by defendant to be false and Peter Bankins relied on the representation and was thereby induced to part with such property.
Missouri Charge Code: 570.030-043Y20202399.0

## COUNT XXXII

The defendant, in violation of Section 570.030, RSMo, committed the class D felony of stealing by deceit, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or about May 2, 2023, in the County of Callaway, State of Missouri, the defendant appropriated United States currency of a value of at least seven hundred fifty dollars, which property was in the possession of JD Hawkins, and defendant appropriated such property from JD Hawkins and with the purpose to deprive JD Hawkins thereof by deceit in that the defendant represented to JD Hawkins that the defendant would ship JD Hawkins a Winchester Model 63 in exchange for payment from JD Hawkins of $856.60, which representation was false and known by defendant to be false and JD Hawkins relied on the representation and was thereby induced to part with such property.
Missouri Charge Code: 570.030-035Y20202399.0

## COUNT XXXIII

The defendant, in violation of Section 570.030, RSMo, committed the class A misdemeanor of stealing by deceit, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or about August 24, 2022, in the County of Callaway, State of Missouri, the defendant appropriated United States Currency of a value of at least one hundred fifty dollars, which property was in the possession of Brayden Welch, and defendant appropriated such property from Brayden Welch and with the purpose to deprive Brayden Welch thereof by deceit in that the defendant represented to Brayden Welch that defendant would ship to Brayden Welch a Ruger Precision Rimfire 17 HMR

Caliber in exchange for payment from Brayden Welch of $450.00 which representation was false and known by defendant to be false and Brayden Welch relied on the representation and was thereby induced to part with such property.
Missouri Charge Code: 570.030-043Y20202399.0

## COUNT XXXIV

The defendant, in violation of Section 570.030, RSMo, committed the class D felony of stealing by deceit, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or about July 15, 2022, in the County of Callaway, State of Missouri, the defendant appropriated United States currency of a value of at least seven hundred fifty dollars, which property was in the possession of Jacob Moak, and defendant appropriated such property from Jacob Moak and with the purpose to deprive Jacob Moak thereof by deceit in that the defendant represented to Jacob Moak that the defendant would supply to Jacob Moak a S&W M&P Sport II in exchange for payment from Jacob Moak of $753.64, which representation was false and known by defendant to be false and Jacob Moak relied on the representation and was thereby induced to part with such property.
Missouri Charge Code: 570.030-035Y20202399.0

## COUNT XXXV

The defendant, in violation of Section 570.030, RSMo, committed the class A misdemeanor of stealing by deceit, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or about February 7, 2023, in the County of Callaway, State of Missouri, the defendant appropriated United States Currency of a value of at least one hundred fifty dollars, which property was in the possession of Jason McCutcheon, and defendant appropriated such property from Jason McCutcheon and with the purpose to deprive Jason McCutcheon thereof by deceit in that the defendant represented to Jason McCutcheon that defendant would ship to Jason McCutcheon a Unis Ginex Primer Small pistol 5000/CS in exchange for payment from Jason McCutcheon of $418.67 which representation was false and known by defendant to be false and Jason McCutcheon relied on the representation and was thereby induced to part with such property.
Missouri Charge Code: 570.030-043Y20202399.0

## COUNT XXXVI

The defendant, in violation of Section 570.030, RSMo, committed the class D felony of stealing by deceit, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or about December 15, 2022, in the County of Callaway, State of Missouri, the defendant appropriated United States currency of a value of at least seven hundred fifty dollars, which property was in the possession of Scott Hanrahan, and defendant appropriated such property from Scott Hanrahan and with the purpose to deprive Scott Hanrahan thereof by deceit in that the defendant represented to Scott Hanrahan that the defendant would ship Scott Hanrahan a Browning X-Bolt Medallion 270 Win 4+1 in exchange for payment from Scott Hanrahan of $1,051.99, which representation was false and known by defendant to be false and Scott Hanrahan relied on the representation and was thereby induced to part with such property.
Missouri Charge Code: 570.030-035Y20202399.0

## COUNT XXXVII

The defendant, in violation of Section 570.030, RSMo, committed the class D felony of stealing by deceit, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or about May 5, 2023, in the County of Callaway, State of Missouri, the defendant appropriated United States currency of a value of at least seven hundred fifty dollars, which property was in the possession of Karen Brooks, and defendant appropriated such property from Karen Brooks and with the purpose to deprive Karen Brooks thereof by deceit in that the defendant represented to Karen Brooks that the defendant would supply to Karen Brooks a Browning S&W model 63 in exchange for payment from Karen Brooks of $939.32, which representation was false and known by defendant to be false and Karen Brooks relied on the representation and was thereby induced to part with such property.
Missouri Charge Code: 570.030-035Y20202399.0

## COUNT XXXVIII

The defendant, in violation of Section 570.030, RSMo, committed the class D felony of stealing by deceit, punishable upon conviction under Sections 558.002 and 558.011, RSMo, in that on or about November 23, 2022, in the County of Callaway, State of Missouri, the defendant appropriated United States currency of a value of at least seven hundred fifty dollars, which property was in the possession of Larry Vollmar, and defendant appropriated such property from Larry Vollmar and with the purpose to deprive Larry Vollmar thereof by deceit in that the defendant represented to Larry Vollmar that the defendant would ship Larry Vollmar a Springfield Armory .308 Winchester Mag. in exchange for payment from Larry Vollmar of $1,219.39, which representation was false and known by defendant to be false and Larry Vollmar relied on the representation and was thereby induced to part with such property.

Missouri Charge Code: 570.030-035Y20202399.0

The facts that form the basis for this information and belief are contained in the attached statement(s) of probable cause as required by Rule 22.02, and in conformance with, Rule 22.03, which statement (s) are made a part hereof and are submitted herewith for this court to find the existence of probable cause or to comply with applicable rule.

BENJAMIN J. MILLER
PROSECUTING ATTORNEY

/s/ Sandra J. Colhour

Sandra J. Colhour, #44119
Assistant Prosecuting Attorney
County of Callaway
State of Missouri

IN THE CIRCUIT COURT OF CALLAWAY COUNTY, MISSOURI

In Re the Marriage of:                          )
NICOLE JENAE ELLIOTT  and                       )
MICHAEL STORM MULLETT                            )
                                                )
NICOLE JENAE ELLIOTT,                            )
                                                )        Case No.:  23CW-FC00490
                        Petitioner,             )
                                                )
        v.                                      )
                                                )
MICHAEL STORM MULLETT,                           )
                                                )
                        Respondent.             )

**JUDGMENT AND DECREE OF DISSOLUTION**

Now on this __1th__ day of July, 2024, Petitioner, Nicole Jenae Elliott, appears by counsel,

Gaylin Carver, and Respondent, Michael Storm Mullett, appears by counsel, Rebekah Cline.

WHEREUPON this cause now coming on regularly for hearing, the parties announce

readiness and evidence is adduced by affidavit.  Whereupon, the case is submitted to the Court

upon the verified Petition and the evidence.  Based thereupon the Court finds that:

1.      All jurisdictional and venue requirements have been met.

2.      Petitioner and Respondent were married on the 27th day of January, 2017, in

Fulton, Missouri, said marriage being registered in Callaway County, Missouri.

3.      That Petitioner's social security number and Respondent's social security number

are on file with this Court.

4.      Petitioner and Respondent have been residents the State of Missouri for ninety

(90) days next preceding the commencement of this proceeding.  Petitioner resides in Callaway

County and Respondent resides in Clay County.

5.      That thirty (30) days have elapsed since the filing of the Petition.

6.     That neither party is a member of the Armed Forces of the United States on active duty.

7.     That Petitioner is not now pregnant.

8.     That the parties have entered into a Separation Agreement which is found to not be unconscionable as to either party, and which divides and distributes all marital assets and liabilities.

9.     That there was one child born of the marriage, to wit: Evelyn Mullett; Petitioner and Respondent have joint legal and physical custody of the child, pursuant to the Joint Parenting Plan that is attached to the Separation Agreement; that child support to be paid by Respondent to Petitioner is $215.00 per month per child.

10.     Neither Petitioner nor Respondent, nor any members with whom either of them reside, have ever been found guilty of or plead guilty to any offenses under Chapters 566 and 568 of the Missouri Revised Statutes.

11.     That neither Petitioner nor Respondent requests maintenance.

12.     That there remains no reasonable likelihood that the marriage of the parties can be preserved and, therefore, the marriage is irretrievably broken.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that the marriage heretofore existing between the Petitioner and Respondent is hereby dissolved.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court as follows:

1.     The Separation Agreement between the parties is hereby approved and incorporated in this Decree and the parties are ordered to perform according to the terms thereof.

2.     Petitioner is awarded as her sole and separate property such real and personal property as set forth in the filed Separation Agreement.

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM

3.    Respondent is awarded as his sole and separate property such real and personal property as set forth in the filed Separation Agreement.

4.    Petitioner is ordered to assume and pay those debts and liabilities as set forth in the filed Separation Agreement and to hold Respondent harmless therefrom.

5.    Respondent is ordered to assume and pay those debts and liabilities as set forth in the filed Separation Agreement and to hold Petitioner harmless therefrom.

6.    All debts incurred by either party after the date of separation, not specifically set aside herein to either party, shall be the sole responsibility of the party incurring said debt.

7.    Each party shall satisfy the other that their respective liabilities are being paid pursuant to its terms and each shall indemnify and hold harmless the other and defend him or her from and against all claims and liabilities arising from any failure to pay those debts and liabilities.

8.    The custody of the parties'  minor child is awarded to Petitioner and Respondent jointly pursuant to the Separation Agreement which is incorporated by reference.

9.    Respondent shall pay to Petitioner the sum of Two Hundred and Fifteen dollars ($215.00) per month for the support of said minor child, said payments to be payable in advance on the first of each month commencing August 1, 2024, through the Family Support Payment Center.  Pursuant to the terms of Section 452.350.1, upon application of Petitioner or the Missouri Division of Child Support Enforcement of the Department of Social Services, Respondent's wages or other income shall be subject to withholding without further notice if Respondent becomes delinquent in the child support payments in an amount equal to one month's total support obligation.  Such withholding shall be for the current month's child support; and the withholding shall include an additional amount equal to fifty (50) percent of one month's

child support to defray delinquent child support, which additional withholding shall continue until the delinquency is paid in full. The Court finds that an automatic income withholding pursuant to Section 452.350 (RSMo 1993) is unnecessary and an alternative arrangement for payment is provided for in the Agreement.

10.     No maintenance shall be paid to either party by the other.

11.     The terms of this Decree are not modifiable, except as to child support and custody over which this Court shall retain jurisdiction.

12.     Absent exigent circumstances as determined by a Court with jurisdiction, all parties to this action are ordered to notify, in writing by certified mail, return receipt requested, at least sixty days prior to the proposed relocation, each party to this action of any proposed relocation of the principle residence of the child, including the following information:

(a)     The intended new residence, including the specific address and mailing address, if known, and if not known, the city;

(b)     The home telephone number of the new residence, if known;

(c)     The date of the intended move or proposed relocation;

(d)     A brief statement of the specific reasons for the proposed relocation of the child; and

(e)     A proposal for a revised schedule of custody or visitation with the child.

The obligation to provide this information to each party continues as long as any party by virtue of this Order is entitled to custody of a child covered by this Order. A party's failure to obey the Order of this Court regarding the proposed relocation may result in further litigation to enforce such Order, including contempt of Court. In addition, a party's failure to notify a party of a relocation of the child may be considered in a proceeding to modify custody or visitation

with the child. Reasonable costs and attorney fees may be assessed against a party if that party fails to give the required notice.

In the event of noncompliance with this order, the aggrieved party may file a verified motion for contempt. If custody, visitation, or third-party custody is denied or interfered with by a parent or third party without good cause, the aggrieved person may file a family access motion with the court stating the specific facts that constitute a violation of the custody provisions of the judgment of dissolution, legal separation, or judgment of paternity. The circuit clerk will provide the aggrieved party with an explanation of the procedures for filing a family access motion and a simple form for use in filing the family access motion. A family access motion does not require the assistance of legal counsel to prepare and file.

13. Each party is to be responsible for his or her own attorney's fees.

14. Costs taxed to Petitioner.

COURT SEAL OF

_Sue Crane_
Honorable Sue Crane, Division VII

CALLAWAY COUNTY

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM

IN THE CIRCUIT COURT OF CALLAWAY COUNTY, MISSOURI

In Re the Marriage of:
NICOLE JENAE ELLIOTT and
MICHAEL STORM MULLETT

NICOLE JENAE ELLIOTT,

    Petitioner,

       Case No.: 23CW-FC00490

MICHAEL STORM MULLETT,

    Respondent.

SEPARATION AGREEMENT

THIS AGREEMENT, made and entered into this __18__ day of __July__, 2024, by and between Michael Storm Mullett (hereinafter referred to as "Husband") and Nicole Jenae Elliott (hereinafter referred to as "Wife").

WITNESSETH:

WHEREAS, the parties to this Agreement were married on the 27th day of January, 2017, and separated finally on the 19th day of September, 2023; and

WHEREAS, it is the intention of the parties hereto to continue to live separate and apart and not to resume the marital relationship between them; and

WHEREAS, it is the intention of the parties to settle, compromise and fully dispose of all their property rights and interest, statutory and otherwise, as the result of or arising out of the marriage of the parties hereto; and

WHEREAS, by reasons of irreconcilable differences which have arisen between the parties, they have concluded that their marriage is irretrievably broken and cannot be preserved, and that a proceeding for dissolution of marriage has been instituted in the Circuit Court of Callaway County, Missouri, and that the parties hereto have agreed as follows with respect to the maintenance of each party, and the disposition of property, and custody, visitation and support of the child born of the marriage, to wit: Evelyn Mullett; and

NOW, THEREFORE, for valuable consideration, each received by the other and for mutual promises herein contained, it is agreed as follows:

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM

## I.  DIVISION OF PROPERTY

A.    The parties hereto have, before the execution of this Agreement, physically divided and taken into their respective personal possession substantially all personal property in which either party hereto has any interest and which is not hereinafter specifically referred to. Each party does hereby transfer and quitclaim unto the other party all of his or her interest in and to all of the personal property now in the possession of the other party and which is not hereinafter specifically referred to. It is understood and agreed that each of the parties shall retain all personal property that is in the possession of either of them and which is not hereinafter specifically referred to as his or her sole and separate property, as the case may be. The parties make specific reference to the following division of personal property:

1.    Husband hereby releases and quitclaims to Wife all of his right, title and interest in and to the following:

(a)    All of Wife's clothing, jewelry and personal effects;

(b)    All of Wife's employment benefits, including pension and retirement benefits, deferred compensation accounts, and all IRAs and 401(K) investments in her name alone;

(c)    All savings and checking accounts in Wife's name alone;

(d)    All life insurance policies on the life of the Wife and the minor child not specifically referred to hereafter;

(e)    2016 Ford Escape, subject to the indebtedness thereon, if any, which Wife shall assume and pay and hold Husband harmless therefrom.

2.    Wife hereby releases and quitclaims to Husband all of her right, title and interest in and to the following:

(a)    All of Husband's clothing, jewelry and personal effects;

(b)    All of Husband's employment benefits, including pension and retirement benefits, deferred compensation accounts, and all IRAs and 401(K) investments in his name alone;

(c)    All savings and checking accounts in Husband's name alone;

(d)    All life insurance policies on the life of the Husband not specifically referred to hereafter;

(e)    2020 Dodge Truck, subject to the indebtedness thereon, if any, which Husband shall assume and pay and hold Wife harmless therefrom;

(f)    Husband's Four Wheeler.

B.    Remaining Personal Property, Household Goods and Furnishings: The parties acknowledge that Wife has provided Husband the opportunity to inventory the marital residence and retrieve the personal property, household goods and furnishings that he desires. Notwithstanding the foregoing, the parties agree that there is certain property that Husband was

2

Doc ID: 65bd5e6fb2d27028bd9c55fcf4d436b6a163bf86

either unable to locate or unable to retrieve. Wife shall provide the opportunity to Husband to make one final trip to the marital residence on Sunday, July 21, 2024 between 1:00 p.m. and 3:00 p.m. to retrieve the following remaining items, if able to be located:

1. Weber grill, grill station and grill supplies;
2. Leaf blower;
3. Show case in the garage;
4. Saw horses;
5. Bag toss;
6. Tools from red tool box;
7. Grandmas Shovel;
8. Mason Jars.

If any of these items are unable to be located, but Wife finds them in the future, she shall immediately notify Husband and provide him the opportunity to retrieve the same.

C.   The parties acknowledge that they do not own any real estate.

## II. ASSUMPTION OF DEBTS AND LIABILITIES

A.   All debts incurred by the Wife after the date of separation shall be the sole responsibility of the Wife and all debts incurred by the Husband after the date of separation shall be the sole responsibility of the Husband. Each party shall pay any debt secured by property set aside to them in this Agreement.

B.   Husband shall be responsible for payment of the debts and shall hold Wife harmless in connection therewith as follows:

1. Any debt associated with Meadowlark Outfitters LLC, including any real estate rents due and owing, any judgments, debts, or monies owed to any individuals, companies, or otherwise associated with Husband's activities related to firearms, or firearm paraphernalia, including but not limited to the following:

    (a)   Mo. Dept of Revenue back taxes
    (b)   Any debt owed to RSR Group
    (c)   Any debt associated with Callaway County Case 23CW-CR01239-01

2. Any debt owed to Zanders Sporting Goods Co. Callaway County Case No. 22CW-CV00764
3. Debt owed to The Bank of Missouri #172169
4. All other credit debts and store charges, if any, incurred solely by Husband and standing solely in Husband's name.
5. All credit debts, store charges, or other liabilities standing in the name of the minor child.

3

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM

6. All debts related to or secured by any personal property set aside to Husband herein, if any.

C.      Wife shall be responsible for payment of the debts and hold Husband harmless in connection therewith as follows:

1. Debt incurred by Husband owed to Truescape Landscaping LLC which has already been paid in full (23CW-MC00421).
2. All other credit debts and store charges, if any, incurred solely by Wife and standing solely in Wife's name.
3. All debts related to or secured by any personal property set aside to Wife herein, if any.

D.      Each party shall be responsible for the payment of his or her own attorney's fees incurred in this action for dissolution of marriage; and Wife will pay the court costs incurred herein.

E.      Each party shall satisfy the other that his or her respective liabilities are being paid pursuant to its terms and each agrees to indemnify and hold harmless the other and to defend him or her from and against all claims and liabilities arising from any failure to pay those debts and liabilities, including, but not limited to, any attorney fees and court costs incurred in defending such claims.

## III. CUSTODY, VISITATION AND CHILD SUPPORT

A.      Custody/Visitation: The parties agree that the parties shall share the joint legal and joint physical custody of the minor child born of the marriage, to-wit: ▮▮▮▮ born ▮▮▮▮▮▮ as set forth in the Joint Parenting Plan, attached hereto, marked "Exhibit A," and incorporated herein, and that such Joint Parenting Plan is in the best interests of the minor child and the parties hereto.

B.      Child Support:

1. Wife is employed at William Woods College, in Fulton, Missouri, and her average gross monthly income is approximately ▮▮▮▮ Husband is employed at ~~Amazon Distribution Center, in Ashland, Missouri~~, *Embassy Landscaping Group in Kansas City, Missouri.* and his average gross monthly income is approximately $2,425.00. Additionally, Husband receives Social Security benefits in the amount of $959.00 per month. The parties agree that the presumed correct child support, as calculated pursuant to Supreme Court Rule 88.01, Section 452.340 RSMo. (1998), and Form 14, is $215.00 per month for the support of the minor child and, that after consideration of all relevant factors pursuant to Section 452.340.8 and Rule 88.01, the parties agree that this figure is just and appropriate, and therefore Husband agrees to pay $215.00 per month for the

4

completes at least twelve hours of credit each term at an institution of vocational or higher education and achieves grades sufficient to re-enroll at such institution, the parental support obligation shall continue until the child completes his education, or until the child reaches the age of twenty-two, whichever first occurs. To remain eligible for such continued parental support, the child shall submit to each parent a transcript provided by the institution of vocational or higher education which includes the courses the child is enrolled in and has completed for each term, the grades and credit received for each such course, and the courses which the child is enrolled in for the upcoming term and the number of credits for each such course. If the circumstances of the child manifestly dictate, the court may waive the October first deadline for enrollment required by this subsection. If the child is enrolled in such an institution, the child or obligated parent may petition the court to amend the order to direct the obligated parent to make the payments directly to the child. As used in this section, an "institution of vocational education" means any postsecondary training or schooling for which the student is assessed a fee and attends classes regularly. "Higher education" means any junior college, college or university at which the child attends classes regularly.

4. The parties acknowledge that this provision is made pursuant to Section 452.340 RSMo 1990, and if said statute is amended, such amendments may be substituted later.

5. The parties agree that a qualified medical child support order, pursuant to Section 609 of the Employment Retirement Income Security Act of 1974 as amended "ERISA," which was amended by the Omnibus Reconciliation Act of 1993 (29 USCA 1169), and/or a health benefit child support order, pursuant to Sections 454.600 through 454.700 RSMo. and ERISA 609, is not necessary. Wife agrees to maintain the child's enrollment in her health insurance plan that she has available to her through her employment. Husband and Wife will equally divide all medical, pharmaceutical, psychological, psychiatric, ophthalmologic, dental and orthodontic expenses not covered by insurance. Husband and Wife agree to cooperate with each other in providing all forms necessary to submit health care claims. If a parent incurs an expense to a health care provider that is not covered by the health benefit plan that would have been covered, or covered at a more favorable rate, if a provider that is covered by the health benefit plan had been used, then that parent shall pay 100% of the uncovered expenses.

6

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM

6. In the event Wife shall not have health insurance available, Husband shall enroll the minor child in his employer provided health insurance and Wife shall reimburse him for half of the cost of out of pocket premium paid by Husband, if any. In the event Husband has to enroll the child in health insurance, Wife shall provide the child's information necessary for him to do so.

3. **Present Medical Bills** The Wife shall give to the Husband the bills evidencing uncovered Medical Care costs for said Minor Child and the Husband shall pay his percent of the obligation when due.

## IV. <u>MAINTENANCE</u>

The parties agree, after examining all relevant factors, including the situation of the parties at the present time, that no maintenance is to be paid by either party for the support of the other, recognizing that, by this provision, they each waive the right to return to court to request and receive maintenance.

## V. <u>TAXES</u>

The parties promise and agree that they will file separate 2023 federal and state income tax reports but will cooperate with each other so as to exchange necessary information so that said reports can be accurately and timely filed. In the event there is either a tax liability due or a refund payable, it will be either assumed or received by said party, as the case may be.

In the event that there should be any deficiency assessment or other change with respect to the joint income tax returns for the years that the parties were married, all sums determined to be due thereon, including penalties and interest, shall be paid by the party who has failed to report his or her income or who has claimed deductions which have been disallowed as expenses against his or her income or reported erroneous information. Said party shall hold the other harmless from all assessments, penalties, interest and any other expenses (including but not limited to attorney's fees and accountant's fees) in connection with any audit or examination of the returns by any taxing authority. The responsible party shall promptly pay all income taxes, penalties and assessments due on any joint income tax returns as a result of the failure to report income or the disallowance of deductions or the reporting of erroneous information.

Wife shall be entitled to claim the parties' minor child as a dependency exemption for all tax years.

## VI. <u>GENERAL PROVISIONS</u>

A. The parties hereinafter shall live separate and apart. Each party shall be free from interference, authority and control, direct or indirect, by the other. Neither shall molest the other nor compel or endeavor the other to cohabit or dwell with him or her.

7

B.     Subject to the provisions herein contained, all other property, real and personal, and wherever situated, now or hereafter acquired by either party individual, shall be and remain the sole and separate property of such party, free from all rights and interest of the other, and each hereby conveys and releases to the other all his or her interest in the property of the other now held or hereafter acquired.  Each party hereby releases and waives all benefits conferred upon him or her by reason of the common law statutes relating to marital rights and all other rights in the estate of the other, including inheritance and the right to administer upon the estate of the deceased.

C.     Each party shall execute all such papers as may be necessary to enable the other party to deal with his or her property and to carry out the purposes and intent of this Agreement.

D.     The provisions of this Agreement or the substance thereof shall be made a part of and incorporated into any decree of dissolution of marriage entered by the Court.

E.     In the event that any provision of this Agreement is unenforceable when incorporated as part of the court's judgment, it shall be considered severable and enforceable by an action based on contractual obligation and it shall not invalidate the remainder of this Agreement as incorporated in any decree.

F.     This Agreement contains the entire understanding of the parties and there are no representations, warranties, covenants or undertakings other than those expressly set forth herein.  Any modification or waiver of any of the provisions of this Agreement shall be effective only if made in writing and executed with the same formality as this Agreement.  The provisions and obligations contained herein are to be considered as not dischargeable in bankruptcy and are in the nature of support.

G.     Each of the parties shall, from the date of this Agreement, have the right to dispose of his or her property by inter vivos conveyance, gift, last will or otherwise, as though a single person.

H.     The parties each fully understand the provisions of this Agreement and each party acknowledges that this Agreement is fair and equitable, that it is being entered into voluntarily and that it is not the result of any duress or any undue influence.  Further, Husband understands and acknowledges that Gaylin Carver serves as attorney for Wife and does not represent Husband in this action, and Wife understands and acknowledges that Rebekah A. Cline serves as attorney for Husband and does not represent Wife in this action. Both parties have had adequate opportunity to consult with counsel, ask questions and understand the terms of the Agreement being reached between the parties; to consult with an independent tax adviser regarding the tax consequences of this Agreement, and to consult with a financial adviser regarding the financial aspects of this Agreement.  Both parties are satisfied with the respective services provided by his/her counsel.

8

I.     Each party shall at all times keep the other party informed of his or her place of residence and shall promptly notify the other party of any change, giving the address of the place of residence, as long as the child is a minor.

J.     Except as otherwise stated herein, all the provisions of this Agreement shall be binding upon the respective heirs, next of kin, executors and administrators of the parties.

K.     In the event that either party to this Agreement brings an action for failure to perform any of the obligations imposed by this Agreement on him or her, or for enforcement or clarification of the Agreement, the prevailing party in such action shall have the right to recover his or her attorney's fees and litigation costs reasonably expended in prosecuting or defending the action.  However, no attorney's fees shall be so recovered by a party filing an action unless that party seeking to recover said attorney's fees and costs shall have mailed to the breaching party written notice of the alleged failure to perform, and said alleged failure was not cured within ten (10) days after the date of mailing said notice by certified mail to the alleged breaching party's business or residence address.  However, no such notice shall be required for child support arrearages.

L.     Both parties recognize that all claims with respect to property subject to division have been settled upon the signing of this Agreement.  The parties recognize that they are entitled to receive discovery from the other party and have discussed that matter with counsel.  If no discovery has occurred, it is because the parties have requested that none occur.  Moreover, both spouses have exchanged schedules of assets and property, which each has provided to the other as their representation under oath.  Each party warrants and represents that this Agreement has been executed with full knowledge of the nature and extent of property which is subject to distribution.  Both parties, by signing this Separation Agreement, desire to settle this matter and waive their right to have this matter adjudicated by the Court.

M.     The parties shall confer on the division of any property not disposed of by this Agreement, which later comes to either party's attention.  If they cannot agree upon the disposition of such property within 60 days of the property being brought to each party's attention, then all of said personal property shall be sold to the highest bidder at a public sale to be held within the following 60 days and the net proceeds derived therefrom divided equally between the parties.  If the asset located is not amenable to public sale, then it shall be equally divided between the parties.

N.     The parties acknowledge that they have had adequate time to review all discovery that has been received, they do not request any additional discovery, and that they are satisfied with the services of the respective counsel.  Each acknowledges that they have made to their satisfaction that investigation concerning the nature, extent and value of the property, income and assets as they have deemed necessary.  Each recognizes that in the event of a trial, they might receive more or they might receive less than provided under the terms of this Agreement.  They each acknowledge that they have made the decision to accept the terms of this Agreement of their own free will and volition and have not been induced, unduly influenced or coerced into

9

said decision. It is the belief of each party that the terms of this Agreement are just, equitable and not unconscionable.

O. The parties acknowledge that they have been separately advised by their respective attorneys that there may be certain tax consequences pertaining to this agreement, that neither attorney has furnished tax advice with respect to this agreement, that each party has been directed and advised to obtain independent tax advice from qualified tax accountants or tax counsel prior to signing this agreement and that they have had the opportunity to do so.

P. This Agreement is entered into with the understanding and based upon the assumption that both parties have made full disclosure of all of their income and assets and the values thereof in the Income and Expense Statements and Financial Statements to be filed with the Court. Each party does hereby represent that his/her Income and Expense Statements and Financial Statements are true and accurate to the best of his/her knowledge, information and belief and that no property exists which is not reflected on said financial statements and which has not been disclosed and disposed of under the terms of this Agreement. Each party relies upon the above representations of the other.

Q. The parties warrant that they have each disclosed to the other the full extent of their respective properties and income, and each acknowledges that the other has made full disclosure thereof. Each party acknowledges that, in the negotiations and finalization of this Agreement and acts and transactions referred to herein, each has made an independent investigation concerning the nature, extent and value of the real and personal property of the parties and that the provisions hereof are just, equitable and not unconscionable, and merit the approval and confirmation of any court called to adjudge rights and relations.

R. Each party to this Agreement agrees that this document shall also act as a release of any and all claims or causes of action which one party may have against the other party and/or their respective attorneys, which existed prior to the date of this Agreement.

S. This Agreement shall become effective between the parties when approved by the Circuit Court of Callaway County. If no decree containing the foregoing findings and dissolving the marriage of the parties shall have been entered by the court within six (6) months of the date hereof, this Agreement shall, at the option of either party, thereafter become null and void, and of no effect whatsoever, except as to provisions intended to apply between the date of this Agreement and the date of the dissolution of marriage.

T. The validity and construction of this Agreement shall be determined in accordance with the laws of the State of Missouri.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the day and year first above written.

10

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM

Dated: 07/14/2024

Nicole Jenae Elliott
Nicole Jenae Elliott (Jul 18, 2024 15:36 CDT)
Nicole J. Elliott

Dated: 07 / 18 / 2024

MM

Michael S. Mullett

11

STATE OF MISSOURI )
) ss.
COUNTY OF COLE )

Now on this 18th day of _July_, 2024 before me personally appeared Nicole J. Elliott, to me known to be the person who executed the foregoing instrument and acknowledge that she executed the same as her free act and deed.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal at my office in said County the day and year first above written.

_Amanda Joy Jensen_
Notary Public

My Commission Expires:

AMANDA JOY JENSEN
Notary Public - Notary Seal
STATE OF MISSOURI
Cole County
My Commission Expires: January 19, 2027
Commission #23596345

STATE OF MISSOURI )
) ss.
COUNTY OF BOONE )

Now on this 18th day of _July_, 2024, before me personally appeared Michael S. Mullett, to me known to be the person who executed the foregoing instrument and acknowledge that he executed the same as his free act and deed.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal at my office in said County the day and year first above written.

Notary Public

My Commission Expires: April 10, 2026

LYDIA GREEN
NOTARY PUBLIC - NOTARY SEAL
STATE OF MISSOURI
COMMISSIONED FOR BOONE COUNTY
MY COMMISSION EXPIRES APR. 10, 2026
ID #22214663

12

Not an Official Court Document

**EXHIBIT A**

**JOINT PARENTING PLAN**

**A. Child Subject to Plan (Name, social security number, and age of each child for whom this plan is proposed):**

1.  ████████████████ years

**B. Standard Orders for Parenting:**

1.  Each parent shall always keep the other parent informed of his or her actual residence address, mailing address if different, and home and work telephone numbers.

2.  Each parent shall provide the other parent with a basic itinerary, destinations, and telephone numbers for emergency purposes when traveling out-of-town with the child.

3.  Each parent may make decisions regarding the day-to-day care and control of the child and in emergencies affecting the health and safety of the child while the child is residing with him or her.

4.  Recognizing the needs of the child for a continuing relationship with each parent, each parent shall attempt to use their best efforts to foster the respect, love and affection of the child toward each parent. Each party agrees to take no action which would obviously demean the other and shall not allow others to do so. Each party shall attempt to set aside any issues and feeling of mutual antipathy for the sake of cooperating in the rearing of their child.

5.  Neither party shall interfere with, or in any way hinder, the child's desire to call and speak with either parent over the telephone at any time.

6.  All court related and financial communications between the parents shall occur at a time when the child are not present and , therefore, shall not occur at times of exchanges of the child or during telephone visits with the child.

7.  Each parent shall inform the other parent as soon as possible of all school, sporting and other special activity notices and cooperate in the child's consistent attendance at such events.

8.  At least 48 hours notice of any schedule changes shall be given to the other parent, and the parent requesting a change shall be responsible for any additional child care that results from the change.

**C. Legal Custody:**

1.  MOTHER and FATHER shall have joint legal custody of the minor child,

13

2.     Joint legal custody means that the parents share the decision-making rights, responsibilities, and authority relating to the health, education, and welfare of the child.

3.     The parties shall confer, discuss, and attempt in good faith to reach agreement regarding all decisions involving the child's health, education and welfare. This includes, *but is not limited to*, decisions about things such as:

    a.  The choice or change of schools, including college or special tutoring;
    b.  The choice or change of doctor, surgeon, specialist, or dentist;
    c.  Church or religious instruction, training, or education;
    d.  Selection of regular child-care including daycare, babysitters, and afterschool programs;
    e.  Major medical care, surgery, or any medical procedure requiring hospitalization or out-patient surgery;
    f.  Major dental work and orthodontic treatment;
    g.  Psychological or psychiatric treatment or counseling;
    h.  The choice or change of camps or other special or extracurricular activities including sports;
    i.  The extent of the child's travel away from home;
    j.  Actual or potential legal action on behalf of a child.

4.     The child will continue to be seen by her current primary care physician, dentist and counselor. (or within the practice), unless otherwise agreed by the parents. In the event that the parties are unable to agree on a medical care, dental or other healthcare treatment, they shall defer to the recommendation of the child's treating physician. However, MOTHER shall have the final decision making rights. In the event that the parties are unable to agree on an educational decision, they shall defer to the recommendation of the child's school-teacher. however, MOTHER shall have final decision making rights.

5.     The parent enjoying parenting time with the child is permitted to make daily or everyday decisions on behalf of the child. Examples of these sort of decisions include minor medical treatment, bedtimes, homework, chores, selection of clothing, and normal daily activities. However, the parents are expected to work together to provide the child with consistent routines between households as well as a common understanding of general expectations, guidelines, and rules.

6.     The parent enjoying parenting time with the child may make emergency or urgent decisions on behalf of the child. Emergent or urgent decisions are those that affect the immediate health and/or safety of the child which have to be made before it is possible or reasonably practicable to contact the other parent. The parent who makes the emergent or urgent decision shall advise the other parent of the nature and extent of the situation as soon as possible.

7.     Each parent shall have access to all medical records pertaining to the child and be permitted to consult independently with any and all professionals involved with the child. The parties will consult each other and agree prior to obtaining significant medical, dental or other

14

health care treatment for the child. The parties agree that the child will continue to be cared for by her current medical care providers and will confer and discuss any change in medical providers before a change is made.

8.     Each parent shall notify the other of the dates and times of the child's health-related appointments including, but not limited to, medical, dental, counseling, specialist, dental, and orthodontic appointments.

9.     Each parent will contact the child's school to make arrangements to receive records and notices directly from the school or via app or other electronic method employed by the school.  parents shall be responsible for obtaining information about special activities, parent teacher conferences, games, recitals, lessons, appointments, and other activities involving the child.

10.     Each parent shall be responsible for obtaining information regarding parent-teacher conferences, IEP/504 meetings, and other meetings or appointments with the child's educational providers.  If possible, the parents will cooperate to jointly attend and participate in these meetings.  If not possible, then the parents will share information to ensure each has the ability to meaningfully participate in decisions concerning the child and her education.

11.     Each parent shall keep the other informed regarding the child's extracurricular activities including the dates and times of practices and rehearsals, dates and times of lessons, dates and times of performances and games, and other scheduled events to which the child might wish both parents to be invited.

12.     When completing forms, each parent shall be obligated to list the other parent as a parent and to include his/her contact information to the extent same is called for by the form. Neither parent shall list a new spouse or any other third party as a parent on any form.

13.     The parents each recognize that, in sharing joint legal custody, it is necessary to cooperate and to share information regarding their child and the expectation of the Court is that this cooperation is bilateral.  In recognizing this, each parent specifically acknowledges their own responsibility to actively participate in the child's life; to avail him/herself of information concerning the child; to introduce him/herself to the child's teachers, health care providers, coaches, and instructors and to maintain a channel of communication with these persons. Neither parent is permitted to rely exclusively upon the other as a conduit of information.

14.     MOTHER shall have sole access and possession to the child's legal documents such as social security card, birth certificate, passport, driver's license, etc.

D.     **Physical Custody:**

MOTHER and FATHER shall have joint physical custody of the child.  The parties shall exercise physical custody as agreed upon but in the event of disagreement, as follows:

15

1. Regular School Year Parenting Time Schedule:

   a.  The minor child shall reside with MOTHER at all times not set out herein to FATHER.

   b.  FATHER shall have physical custody of the minor child every other weekend from Friday after school or 3:00 p.m. if not in school, until Sunday evening at 7:00 p.m.

   c.  FATHER shall have physical custody of the minor child every Wednesday from afterschool until 8:00 p.m.

2. Regular Summer Parenting Time Schedule: During the School summer break, beginning the first Monday following the last day of school and ending the last Friday prior to school resuming the parties shall follow the following parenting schedule: Commencing the Monday immediately following the child's last day of school, the parents shall follow a "5-2-2-5" parenting time schedule with Mother having custody every Monday and Tuesday to Wednesday morning at 9:00 a.m. and Father having custody every Wednesday and Thursday until Friday morning at 9:00 a.m. and continuing the alternating weekend schedule except that the weekend shall end Monday morning at 9:00 a.m.

3. Extended/Vacation Parenting Time Schedule: Each parent shall have one (1) seven-day period with the children during their summer break from school. Each parent shall provide notice to the other parent of their selected period by April 1 of each year. If the parents happen to choose the same period, then Mother's choice will prevail in even numbered years and Father's choice will prevail in odd numbered years. The parent without prevailing choice shall select an alternative period by April 15.

4. HOLIDAYS: MOTHER and FATHER shall have physical custody of the minor during holidays as follows, FATHER shall have physical custody of the child on FATHER'S DAY WEEKEND every year and holidays in Group A in odd years and holiday group in even years. MOTHER shall have physical custody of the child on MOTHER'S DAY WEEKEND every year and holidays in Group A in Even years and holiday group B in odd years.

GROUP A:

   (a)  THANKSGIVING: From Wednesday before Thanksgiving at 6:00 p.m. until Sunday following Thanksgiving at 6:00 p.m.

   (b)  CHRISTMAS: From 6:00 p.m. the last day of school before Christmas until Christmas Eve at 6:00 p.m.

16

(c) NEW YEARS' EVE: From 9:00 a.m. on New Years Eve until 6:00 p.m. New Years Day.

(d) EASTER WEEKEND: So long as this does not fall on the same weekend as the child's spring break, from 6:00 p.m. Friday to 6:00 p.m. Sunday.

GROUP B:

(a) SPRING BREAK: From 6:00 p.m. the last day of school until 6:00 p.m. the day prior to school resuming.

(b) CHRISTMAS: From Christmas Eve at 6:00 p.m. until December 27th at 6:00 p.m.

(c) CHILD'S BIRTHDAY: From 6:00 p.m. the day before until 9:00 a.m. the day after the child's birthday

5. Priority of Parenting Time Schedule: The Holiday and Special Days Schedule shall take priority over the School Year, Summer Parenting Time Schedules, and Extended/Vacation Parenting Time Schedule. The Extended/Vacation Parenting Time Schedule shall take priority over the School Year and Summer Parenting Time Schedules only.

6. Transportation/Exchanges: To the extent possible the parent whose period of time is beginning shall pick up the child from school, summer care, camp, etc. otherwise the parents shall meet to exchange the child at the Sam's Club in Columbia Missouri (which is almost halfway between the parents residence). Each parent will be responsible for their own transportation costs.

7. Illness of the Child: In the event that a child is ill or otherwise unable to attend school/daycare when in session, the parent scheduled to be concluding their period of parenting time shall remain responsible to provide care for the child until the time that the other parent's regular pick-up time that day.

8. Changes in Custody Schedule: If either parent is unable to exercise a scheduled period of parenting time with the minor child then he/she shall advise the other parent at the earliest opportunity, but no later than twenty-four (24) hours prior to the scheduled start of the custody period. The parent requesting or needing the change will be responsible for any additional costs associated with child care as a result of the change.

9. Right of First Refusal: Both parents agree that both of them are the best ones to watch the child. If the child is to be with either parent and that parent cannot avail himself or herself to the possession of the child, for any overnight period, then the parent who is

17

supposed to have possession shall first offer the other parent the opportunity to be with the child before offering possession of the child to a third party.

10. Telephone/Electronic Access: Father and Mother shall, at all times, have reasonable telephone and electronic access to the child notwithstanding that at any time the child may be living with one or the other of them. Each parent may be permitted to call the child once per day between the hours of 8:00 a.m. and 8:00 p.m. when she is with the other parent.   It is the intent of the parents that Father is not prevented from reasonable telephone/electronic access to the children while she is in the possession of the Mother and that Mother not be prevented from reasonable telephone/electronic access to the child while she is in the possession of the Father.

E.  Support:

1.     CHILD SUPPORT shall be paid by FATHER to MOTHER as set forth in the Judgment of Dissolution.

2.     HEALTH CARE COSTS:  MOTHER, unless the parties agree or the Judgment provides otherwise, shall maintain at his or her cost a health benefit plan covering the minor child through her employer provided health insurance.  All health expenses incurred on behalf of the child by either parent who has joint legal custody and not paid by the health benefit plan shall be paid fifty percent (50%) by each parent if incurred pursuant to the health benefit plan. Except that MOTHER shall be responsible for any out of pocket health expense that does not exceed $100.00. If a parent incurs an expense to a health care provider that is not covered by the health benefit plan that would have been covered, or covered at a more favorable rate, if a provider that is not covered by the health benefit plan had been used, then that parent shall pay seventy-five percent (75%) and the other parent twenty-five percent (25%) of the uncovered expenses. Provided however, the receiving parent shall pay one-hundred percent (100%) of the first $100.00 of health care expenses per year for each child incurred by a parent with a joint or sole legal custody.

3.     EDUCATIONAL AND EXTRAORDINARY EXPENSES:  MOTHER shall pay the educational and extraordinary expenses of the child unless the parties agree or the Judgment provides otherwise.

4.     CHILD CARE EXPENSES:  Unless the parties agree or the Judgment provides otherwise, child care expenses shall be paid by MOTHER.

5.     TAX DEPENDENCY EXEMPTION:  MOTHER shall be entitled to claim the minor child as a tax dependency exemption for state and federal taxes.

F.  Law Regarding Relocation:

1. RELOCATION PURSUANT TO RSMo 452.377(11):  Absent exigent circumstances as determined by a Court with jurisdiction, you, as a party to this action, are ordered to notify in

18

writing by certified mail, return receipt requested, at least sixty days prior to the proposed relocation, each party to this action of any proposed relocation of the principal residence of the child, including the following information:

a. The intended new residence, including the specific address and mailing address, if known, and if not known, the city;
b. The home telephone number of the new residence, if known;
c. The date of the intended move or proposed relocation;
d. A brief statement of the specific reasons for the proposed relocation of the child, if applicable;
e. A proposal for a revised schedule of custody or visitation with the child, if applicable; and
f. The other party's right, if that party is a parent, to file a motion, pursuant to this section, seeking an order to prevent the relocation and an accompanying affidavit setting forth the specific good-faith factual basis for opposing the relocation within thirty days of receipt of the notice.

Your obligation to provide this information to each party continues as long as you or any other party by virtue of this order is entitled to custody of a child covered by this order. Your failure to obey the order of this Court regarding the proposed relocation may result in further litigation to enforce such order, including contempt of Court. In addition, your failure to notify a party of a relocation of the children may be considered in a proceeding to modify custody or visitation with the child. Reasonable costs and attorney fees may be assessed against you if you fail to give the required notice.

19

# In the Circuit Court of Callaway County, Missouri

## Cause No. 23CW-FC00490

In re the Marriage of: NICOLE ELLIOTT, Petitioner, and MICHAEL MULLETT, Respondent

### FORM NO. 14 CHILD SUPPORT AMOUNT CALCULATION WORKSHEET

| CHILDREN | AGE | CHILDREN | AGE |
|---|---|---|---|
| ▮▮▮▮▮▮▮ | 7 | | |
| | | | |

Respondent is the "Parent Paying Support"
Total Number of Children: 1

| | Parent Receiving Support (Petitioner) | Parent Paying Support (Respondent) | Combined |
|---|---|---|---|
| 1. MONTHLY GROSS INCOME | $5,400 | $3,475 | |
| 1a. Monthly court-ordered maintenance being received | $0 | $0 | |
| 2. ADJUSTMENTS 2a. Other monthly child support pursuant to court or administrative order | ( $0 ) | ( $0 ) | |
| 2b. Monthly court-ordered maintenance being paid | ( $0 ) | ( $0 ) | |
| 2c. Monthly support obligation for other children (1) Number of other children primarily residing in each parent's custody | 0 children | 0 children | |
| (2) Each parent's support obligation from support schedule using the parent's Line 1 monthly gross income | $0 | $0 | |
| (3) Monthly child support received under court or administrative order for children included in Line 2c(1) | ( $0 ) | ( $0 ) | |
| 2c. TOTAL adjustment (Line 2c(2) minus Line 2c(3)) | | | |
| 3. ADJUSTED MONTHLY GROSS INCOME (Sum of lines 1 and 1a, minus lines 2a, 2b and 2c) | $5,400 | $3,475 | $8,875 |
| 4. PROPORTIONATE SHARE OF COMBINED ADJUSTED MONTHLY GROSS INCOME (Each parent's line 3 income divided by combined line 3 income) | 60.8% | 39.2% | |
| 5. BASIC CHILD SUPPORT AMOUNT (from support chart using combined line 3 income) | | | $1,124 |
| 6. ADDITIONAL CHILD-REARING COSTS OF PARENTS 6a.(1) Reasonable work-related child care costs of parent receiving support: $0 6a.(2) Child Care Tax Credit (See Directions): $0 | $0 | | |
| 6b. Reasonable work-related child care costs of the parent paying support | | $0 | |
| 6c. Health insurance costs for children who are the subjects of this proceeding | $0 | $0 | |
| 6d. Uninsured agreed-upon or court-ordered extraordinary medical costs | $0 | $0 | |
| 6e. Other agreed-upon or court-ordered extraordinary child rearing costs | $0 | $0 | |
| 7. TOTAL ADDITIONAL CHILD-REARING COSTS (Sum of lines 6a, 6b, 6c, 6d, and 6e) | $0 | $0 | $0 |
| 8. TOTAL COMBINED CHILD SUPPORT COSTS (Sum of line 5 and line 7) | | | $1,124 |
| 9. EACH PARENT'S SUPPORT OBLIGATION (Multiply line 8 by each parent's line 4) | $683 | $441 | |
| 10. CREDIT FOR ADDITIONAL CHILD-REARING COSTS (Line 7 of parent paying support) | | ( $0 ) | |
| 11. ADJUSTMENT for a portion of amounts expended by the parent obligated to pay support during periods of overnight visitation or custody (Multiply line 6 by 20%) | | ( $225 ) | |
| 12. PRESUMED CHILD SUPPORT AMOUNT (Line 9 minus lines 10 and 11) | | $216 | |
| PREPARED BY: Rebekah A. Cline #75169 Attorney for Petitioner | Harper, Evans, Hilbrenner & Netemeyer | | |

# STATE OF MISSOURI
## DEPARTMENT OF CORRECTIONS
# ORDER OF PROBATION

**FORWARD TO**

| CIRCUIT COURT OF | |
|---|---|
| CALLAWAY COUNTY, MISSOURI | |
| **DOCKET NUMBER** | |
| 23CW-CR01239-01 | |

**DEFENDANT**
MICHAEL STORM MULLETT

**ADDRESS**
321 MEADOWLARK LN

**CITY**
FULTON, MO 65251

**COUNTY**

| OFFENSE | | | SENTENCE | TERM OF PROBATION |
|---|---|---|---|---|
| 570.090-001Y | 20202589.0 | Forgery | | |
| 570.130-002Y | 20202605.0 | Fraudlent Use Credit Device | | |
| 570.223-003Y | 20202699.0 | Identity Theft Or Attempt | SES | |
| 570.223-003Y | 20202699.0 | Identity Theft Or Attempt | | 5YRS |
| 570.090-001Y | 20202589.0 | Forgery | | |
| 570.223-002Y | 20202699.0 | Identity Theft Or Attempt | | |
| 570.223-006Y | 20202699.0 | Idnty/Atmpt Idnty Thft-1st Ofn | | |
| 571.063-001Y | 20205209.0 | Fraudulent Purchase Of Firearm | | |
| 570.090-001Y | 20202589.0 | Forgery | | |
| 570.090-001Y | 20202589.0 | Forgery | | |
| 570.030-035Y | 20202399.0 | Stealing - $750 Or More | | |
| 570.030-035Y | 20202399.0 | Stealing - $750 Or More | | |
| 570.030-043Y | 20202399.0 | Stealing | | |
| 570.030-035Y | 20202399.0 | Stealing - $750 Or More | | |
| 570.030-035Y | 20202399.0 | Stealing - $750 Or More | | |
| 570.030-035Y | 20202399.0 | Stealing - $750 Or More | | |

| TOTAL COURT COST | VICTIMS COMP. | RESTITUTION | FINES | ATTORNEY FEES |
|---|---|---|---|---|
| $286.50 | $46.00 | $ | $ | $ |

Your application for probation has been received and approved by this court. In accordance with the authority vested in this court by the laws of the state of Missouri, you are hereby placed on probation for such a period of time as required by statute; or until you have proven by your conduct, to the satisfaction of this court, that you are entitled to discharge from this probation. You are hereby advised that under the law the court may at any time revoke or modify any conditions of the probation, and you shall be subject to arrest upon order of the court. At any time within the period of your probation the court may impose or order execution of sentence for your original offense in accordance with the laws of the state of Missouri, and commit you to such institution provided by law.

It is the further order of the court that your case be assigned to the supervision of the Division of Probation and Parole and its representative Probation and Parole Officer under the following conditions. They are authorized to report to this court on all matters pertaining to your probation, and to make such recommendations and take such action as the court may require in your case.

## CONDITIONS OF PROBATION

1. **LAWS:** I will obey all federal and state laws, municipal and county ordinances. I will report all arrests to my Probation and Parole Officer within 48 hours.
2. **TRAVEL:** I will obtain advance permission from my Probation and Parole Officer before leaving the state or the area in which I am living.
3. **RESIDENCY:** I will obtain advance permission from my Probation and Parole Officer before making any change in residency.
4. **EMPLOYMENT:** I will maintain employment unless engaged in a specific program approved by my Probation and Parole Officer. I will obtain advance permission from my Probation and Parole Officer before quitting my job or program. In the event I lose my job or am terminated from a program, I will notify my Probation and Parole Officer within 48 hours.
5. **ASSOCIATION:** I will obtain advance permission from my Probation and Parole Officer before I associate with any person convicted of a felony or misdemeanor, or with anyone currently under the supervision of the Division of Probation and Parole. It is my responsibility to know with whom I am associating.
6. **DRUGS:** I will not have in my possession or use any controlled substance except as prescribed for me by a licensed medical practitioner.
7. **WEAPONS:** I will not own, possess, purchase, receive, sell, or transport any firearms, ammunition or explosive device, or any dangerous weapon if I am on probation or parole for a felony charge or a misdemeanor involving firearms or explosives, or if it is in violation of federal, state, or municipal laws or ordinances.
8. **REPORTING/DIRECTIVES:** I will report as directed to my Probation and Parole Officer. I will abide by any directives given me by my Probation and Parole Officer.
9. **SUPERVISION STRATEGY:** I will enter and successfully complete any supervision strategy and abide by all rules and program requirements, as directed by the court, Parole Board or my supervising Probation and Parole Officer.
10. **INTERVENTION FEES:** I shall pay a monthly intervention fee in an amount set by Missouri Department of Corrections pursuant to section 217.690, RSMo. This payment shall be due and payable on the first day of the first month following placement on probation, parole or conditional release.
11. **SPECIAL CONDITIONS:** Pay restitution in the amount $119,344.92 at a rate of not less than $2,250 per month commencing June 1, 2025, no earned compliance credits shall accrue, serve 120 days HD commencing within 60 days, pay child support per court order.

As to Counts I [illegible] and [illegible] with [illegible] [illegible] they all [illegible] the rest [illegible] on order.

SJRC (08-21) CR144A     1 of 1 (23CW-CR01239-01)     MO 931-1903 (1-06)

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM

I have read or have had read to me the Order of Probation and the Conditions set out herein. I agree to comply with such conditions during the period of my probation.

| WITNESSED BY | | DATE | PROBATIONER'S SIGNATURE | | DATE |
|---|---|---|---|---|---|
| ASSIGNED | DAY OF | | , YEAR | IN THE CIRCUIT COURT OF | |
| | CALLAWAY COUNTY, STATE OF MISSOURI | | HONORABLE | | |
| ATTEST | | CIRCUIT CLERK | JUDGE OF THE 13TH JUDICIAL CIRCUIT | | |
| DATE OF BIRTH 05-AUG-1985 | RACE/GENDER White/M | | SOCIAL SECURITY NUMBER 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 | ☐ TYPE OF ASSIGNMENT | |
| DOC NUMBER | | | DATE OPENED | | |

# EXHIBIT D

## **SBA – POD Response**

CSNG/ARTIVA Account #: 18584100

SBA Loan Number (Client Reference #): 8868978207

Debtor: Nicole Elliott

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM



Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM



## U.S. Small Business Administration

# AUTHORIZATION
# (SBA 7(A) GUARANTEED LOAN)

| SBA Loan # | 8868978207 |
|---|---|
| SBA Loan Name | MEADOWLARK OUTFITTERS LLC |
| Approval Date | October 28, 2020 |

Lender:
The Bank of Missouri
3610 Buttonwood Dr Ste 100
Columbia, MO 65201

U. S. Small Business Administration (SBA):
St. Louis District Office
1222 Spruce St.
Suite 10.103
St. Louis, MO 63103

SBA approves, under Section 7(a) of the Small Business Act as amended, Lender's application, received **October 28, 2020**, for SBA to guarantee **85.00%** of a loan ("Loan") in the amount of **$37,000.00** to assist:

Borrower:
1.  MEADOWLARK OUTFITTERS LLC
    510 Court St
    Fulton, MO 65251

All requirements in the Authorization which refer to Borrower also apply to any Co-Borrower.

### A. THE GUARANTY FEE IS $629.00.

Lender must pay the guaranty fee within 90 days of the approval date of this Authorization. Failure to timely pay the guaranty fee will result in cancellation of the SBA guarantee. The 90-day deadline may not be extended. Lenders are required to make their payments electronically. Payment can be made at www.pay.gov or by ACH if they have previously enrolled with the SBA. No part of the guaranty fee is refundable if Lender has made any disbursement. Lender may collect this fee from Borrower after initial disbursement of Loan, except when an escrow closing is used, Lender may not collect the fee until all Loan funds have been disbursed to the Borrower from the escrow account, Borrower may use Loan proceeds to reimburse Lender for the guaranty fee.

For loans of $150,000 or less, Lender may retain 25% of any required guaranty fee but must remit the remainder to SBA.

### B. ON-GOING GUARANTY FEE  (Lender's Annual Service Fee):

1.  Lender agrees to pay SBA an on-going guaranty fee equal to 0.550 of one percent per year of the guaranteed portion of the outstanding balance.
2.  Lender may not charge or otherwise pass through this fee to Borrower.

### C. IT IS LENDER'S SOLE RESPONSIBILITY TO:

1.  Close the Loan in accordance with the terms and conditions of this Authorization.
2.  Obtain valid and enforceable Loan documents, including obtaining the signature or written consent of any obligor's spouse if such consent or signature is necessary to bind the marital community or create a valid lien on marital property.
3.  Retain all Loan closing documents. Lender must submit these documents, along with other required documents, to SBA for review if Lender requests SBA to honor its guarantee on the Loan, or at any time SBA requests the documents for review.

### D. REQUIRED FORMS

1.  Lender may use its own forms except as otherwise instructed in this Authorization. Lender must use the following SBA forms for the Loan:

---

SBA Loan Number: 8868978207
SBA Loan Name: MEADOWLARK OUTFITTERS LLC

(7a Wizar



NOTE: LENDER MAY USE ITS OWN NOTE AND GUARANTEE AGREEMENTS IN LIEU OF THE SBA NOTE AND GUARANTEE AGREEMENTS. IF LENDER USES ITS OWN NOTE AND/OR GUARANTEE FORMS, LENDER MUST ENSURE THE DOCUMENTS COMPLY WITH THE REQUIREMENTS SET FORTH IN SOP 50 10.

SBA Form 147, Note or Lender's own Note that complies with SOP 50 10

SBA Form 1050, Settlement Sheet

SBA Form 159, Compensation Agreement, for each required agent

SBA Form 722, Equal Opportunity Poster

Guarantee: SBA Form 148 or Lender equivalent

2. Lender may use computer-generated versions of mandatory SBA Forms, as long as the text is identical.

3. Lender must submit a copy of each completed SBA Form 159 by email to the SBA fiscal and transfer agent after initial disbursement and in conjunction with Lender's 1502 Report for the month. Lender must maintain each original SBA Form 159 in its file.

**E. CONTINGENCIES** --SBA issues this Authorization in reliance on representations in the Loan application, including supporting documents. The guarantee is contingent upon Lender:

1. Having and complying with a valid SBA Loan Guarantee Agreement (SBA Form 750, SBA Form 750B for short-term loans, or 750CA for Community Advantage (CA) loans, if applicable) and any required supplemental guarantee agreements, between Lender and SBA;

2. Having paid the full guaranty fee in the time and manner required by this Authorization and SBA Loan Program Requirements;

3. Complying with the current SOP 50 10 and all applicable appendices;

4. Completing disbursement no later than 48 months from the approval date of this Authorization. (The loan must be fully disbursed within 48 months from the date of this Authorization. Any undisbursed balance remaining after 48 months will be automatically cancelled by SBA.);

5. Having no evidence since the date of the Loan application, or since any preceding disbursement, of any unremedied adverse change in the financial condition, organization, management, operation, or assets of Borrower or Operating Company which would warrant withholding or not making any further disbursement; and,

6. Satisfying all of the conditions in this Authorization.

**F. NOTE TERMS:**

1. **Maturity:** This Note will mature in 6 years and 3 months from date of Note.

2. **Repayment Terms:** If Lender uses its own Note, Lender must comply with the repayment terms set forth below and must ensure the Note is legally enforceable and assignable, has a stated maturity and is not payable on demand. The Note must include the following language:

*"When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law."*

If Lender uses SBA Note, Form 147, Lender must insert into Note, to be executed by Borrower, the following terms, without modification. Lender must complete all blank terms on the Note at time of closing.

The interest rate on this Note will fluctuate. The initial interest rate is 6.50% per year. This initial rate is the Prime Rate in effect on the first business day of the month in which SBA received the loan application, plus 3.25%. The initial interest rate must remain in effect until the first change period begins unless changed in accordance with SOP 50 10.

Borrower must pay a total of 3 payments of interest only on the disbursed principal balance beginning two months from the month this Note is dated and every month thereafter; payments must be made on the fifth calendar day in the months they are due.

Borrower must pay principal and interest payments of **$629.03** every month beginning five months from the month this Note is dated; payments must be made on the **fifth calendar day** in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

The interest rate will be adjusted **every calendar quarter** (the "change period"), beginning **January 1, 2021** (date of first rate adjustment).

SBA Loan Number: 8868978207
SBA Loan Name: MEADOWLARK OUTFITTERS LLC



(7a)Wizar



The "Prime Rate" is the Prime Rate in effect on the first business day of the month (as published in the **The Wall Street Journal** newspaper ) in which SBA received the application, or the first day of the month in which any interest rate change occurs. Base Rates will be rounded to two decimal places with .004 being rounded down and .005 being rounded up.

The adjusted interest rate will be 3.25% above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

The interest rate identified in the Note may not be changed during the life of the Loan unless changed in accordance with SOP 50 10.

The interest rate adjustment period may only be changed in accordance with SOP 50 10.

Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

**Loan Prepayment:**

Notwithstanding any provision in this Note to the contrary:

> **Borrower may prepay this Note.** Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:
>
> a. Give Lender written notice;
>
> b. Pay all accrued interest; and
>
> c. If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.
>
> If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

All remaining principal and accrued interest is due and payable 6 years and 3 months from **date of Note**.

**Late Charge:** If a payment on this Note is more than **10 days** late, Lender may charge Borrower a late fee of up to **5.00%** of the unpaid portion of the regularly scheduled payment.

3. Lender shall comply with Section 432.047 RSMO by adding the following language in boldface ten point type to the Note, Guarantees and other Credit Agreements as defined by the Statute:

"Oral or unexecuted agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt including promises to extend or renew such debt are not enforceable, regardless of the legal theory upon which it is based that is in any way related to the credit agreement. To protect you (Borrower(s)) and us (Creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it."

## G. USE OF PROCEEDS

1. $629.00 to pay the guarantee fee (Lender may not disburse Loan proceeds solely to pay the guarantee fee).

2. $12,000.00 to purchase equipment.

3. $20,000.00 to purchase inventory.

4. $3,960.00 for working capital.

5. $411.00 Packaging and Other Closing Fees

All amounts listed above are approximate. Lender may not disburse Loan proceeds solely to pay the guaranty fee. Lender may disburse to Borrower, as working capital only, funds not spent for the listed purposes as long as those funds do not exceed 20% of the specific purpose authorized or $50,000.00, whichever is less. An Eligible Passive Company may not receive working capital funds or funds to be used for the purchase of other assets, including intangible assets, for the Operating Company's use.

The loan must be made for a sound business purpose and must benefit the small business, and one 7(a) loan may not be split into two 7(a) loans merely to benefit the Lender. 13 CFR 120.120 and 120.130(f).

Lender must document that Borrower used the loan proceeds for the purposes stated in this Authorization. Except under SBA Express, Export Express, and 7(a) Small Loans, Lender and Borrower must complete and sign SBA Form 1050 at the time of first disbursement. Lender must document the first and all subsequent disbursements by attaching required documentation to



the original SBA Form 1050 and must maintain the documentation in the Loan file, following the procedures described in SOP 50 10.

## H. COLLATERAL CONDITIONS

Lender must obtain a lien on 100% of the interests in the following collateral and properly perfect all lien positions.

The following language must appear in Lender's Guarantee when Lender uses its own Guarantee.

*"When SBA is the holder, the Note and this Guarantee will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Guarantee, Guarantor may not claim or assert any local or state law against SBA to deny any obligation, defeat any claims of SBA, or preempt federal law."*

1. **Guarantee on SBA Form 148 or equivalent lender's form**, by **MICHAEL S MULLETT**, resident in Missouri.

2. **Guarantee on SBA Form 148 or equivalent lender's form**, by **NICOLE J ELLIOTT**, resident in Missouri.

3. **First perfected security interest, subject to no other liens, in the following personal property** (including any proceeds and products), whether now owned or later acquired, wherever located: Equipment; Inventory; Accounts; Instruments; Chattel Paper; General Intangibles;

   a. Lender must obtain a written agreement from all Lessors (including sublessors) agreeing to: (1) Subordinate to Lender Lessor's interest, if any, in this property; (2) Provide Lender written notice of default and reasonable opportunity to cure the default; and (3) Allow Lender the right to take possession and dispose of or remove the collateral.

   b. Lender must obtain a list of all equipment and fixtures that are collateral for the Loan. For items with a unit value of $5,000 or more, the list must include a description and serial number, if applicable.

   c. Lender must obtain an appropriate Uniform Commercial Code lien search evidencing all required lien positions. If UCC search is not available, another type of lien search may be substituted.

The following language must appear in all security instruments including Mortgages, Deeds of Trust, and Security Agreements:

*"The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:*

   a) *When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.*

   b) *Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.*

   c) *Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument."*

**Missouri Mandatory Provision**--Lender shall comply with Section 432.047 RSMO by adding the following language in boldface ten point type to the Note, Guarantees and other Credit Agreements as defined by the Statute:

*"Oral or unexecuted agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt including promises to extend or renew such debt are not enforceable, regardless of the legal theory upon which it is based that is in any way related to the credit agreement. To protect you (Borrower(s)) and us (Creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it."*

## J. ADDITIONAL CONDITIONS

### 1. Insurance Requirements

Prior to disbursement, Lender must require Borrower to obtain the following insurance coverage and maintain this coverage for the life of Loan:

   a. **Flood Insurance.** Based on the Standard Flood Hazard Determination (FEMA Form 086-0-32):

   (1) If any portion of a building that is collateral for the Loan is located in a special flood hazard area, Lender must require Borrower to obtain flood insurance for the building under the NFIP.

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM



(2) If any equipment, fixtures, or inventory that is collateral for the Loan ("Personal Property Collateral") is in a building any portion of which is located in a special flood hazard area and that building is collateral for the Loan, Lender must require Borrower to also obtain flood insurance for the Personal Property Collateral under the NFIP.

(3) If any Personal Property Collateral is in a building any portion of which is located in a special flood hazard area and that building is not collateral for the Loan, Lender must require Borrower to obtain available flood insurance for the Personal Property Collateral. Lender may waive this requirement when the building is not collateral for the Loan if it uses prudent lending standards and includes in the Loan file a written justification that fully explains why flood insurance is not economically feasible or, if flood insurance is not available, the steps taken to determine that it is not available.

Insurance coverage must be at least equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the National Flood Insurance Act of 1968, as amended (42 U.S.C. 4001 et seq.), whichever is less. ("Maximum limit of coverage available" is the lesser of the maximum limit available under the NFIP for the type of structure or the insurable value of the structure.) Insurance coverage must contain a <u>MORTGAGEE CLAUSE/LENDER'S LOSS PAYABLE CLAUSE</u> (or substantial equivalent) in favor of Lender. This clause must provide that any action or failure to act by the debtor or owner of the insured property will not invalidate the interest of Lender and SBA. (Borrower will be ineligible for any future SBA disaster assistance or business loan assistance if Borrower does not maintain any required flood insurance for the entire term of the Loan.)

b. **Personal Property Hazard Insurance** coverage (including required additional coverage, such as wind, hail, earthquake, etc., if the business is located in a state that requires additional coverage) on all equipment, fixtures or inventory that is collateral for the Loan, in the amount of full replacement costs. If full replacement cost insurance is not available, coverage must be for maximum insurable value. Insurance coverage must contain a <u>LENDER'S LOSS PAYABLE CLAUSE</u> in favor of Lender. This clause must provide that any action or failure to act by the debtor or owner of the insured property will not invalidate the interest of Lender. The policy or endorsements must provide for at least 10 days prior written notice to Lender of policy cancellation.

c. **Life Insurance,** satisfactory to Lender:

(1) on the life of **Michael S. Mullett** in the amount of **$37,000.00.**

Lender must obtain a collateral assignment of each policy with Lender as assignee, and Lender must also obtain acknowledgment of the assignment by the Home Office of the Insurer. Lender must ensure that Borrower pays the premium on the policy.

d. **Workers' Compensation Insurance** in an amount meeting state law requirements and with an insurance company satisfactory to Lender.

2. **Borrower, Guarantor and Operating Company Documents**

a. Prior to closing, Lender must obtain from Borrower, Guarantor and Operating Company a current copy of each of the following as appropriate:

(1) **Corporate Documents**--Articles or Certificate of Incorporation (with amendments), any By-laws, Certificate of Good Standing (or equivalent), Corporate Borrowing Resolution, and, if a foreign corporation, current authority to do business within this state.

(2) **Limited Liability Company (LLC) Documents**--Articles of Organization (with amendments), Fact Statement or Certificate of Existence, Operating Agreement, Borrowing Resolution, and evidence of registration with the appropriate authority.

(3) **General Partnership Documents**--Partnership Agreement, Certificate as to Partners, and Certificate of Partnership or Good Standing (or equivalent), as applicable.

(4) **Limited Partnership Documents**--Partnership Agreement, Certificate as to Partners, and Certificate of Partnership or Good Standing (or equivalent), as applicable, Certificate of Limited Partnership, and evidence of registration with the appropriate authority.

(5) **Limited Liability Partnership (LLP) Documents**--Partnership Agreement, Certificate as to Partners, Certificate of Partnership or Good Standing (or equivalent) as applicable, and evidence of registration with the appropriate authority.

(6) **Trustee Certification**--A Certificate from the trustee warranting that:

(a) The trust will not be revoked or substantially amended for the term of the Loan without the consent of Lender/SBA;

(b) The trustee has authority to act;

(c) The trust has the authority to borrow funds, guarantee loans, and pledge trust assets;

---

SBA Loan Number: 8868978207

SBA Loan Name: MEADOWLARK OUTFITTERS LLC

(7a Wizar



Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM

(d) If the trust is an **Eligible Passive Company**, the trustee has authority to lease the property to the Operating Company;

(e) There is nothing in the trust agreement that would prevent Lender from realizing on any security interest in trust assets;

(f) The trust agreement has specific language confirming the above; and

(g) The trustee has provided and will continue to provide Lender/SBA with a true and complete list of all trustors and donors.

(7) **Trade Name**--Documentation that Borrower has complied with state requirements for registration of Borrower's or Operating Company's trade name (or fictitious name), if one is used.

b. Prior to closing, Lender must obtain from Borrower and Operating Company:

(1) **Ownership**--Evidence that ownership and management have not changed without Lender's approval since the application was submitted.

## 3. Operating Information

Prior to any disbursement of Loan proceeds, Lender must obtain:

a. **Verification of Financial Information**--Lender must submit IRS Form 4506-T to the Internal Revenue Service to obtain federal income tax information on Borrower, or the Operating Company if the Borrower is an EPC, for the last 3 years (unless Borrower or Operating Company is a start-up business). If the business has been operating for less than 3 years, Lender must obtain the information for all years in operation. This requirement does not include tax information for the most recent fiscal year if the fiscal year-end is within 6 months of the date SBA received the application. If the applicant has filed an extension for the most recent fiscal year, Lender must obtain a copy of the extension along with evidence of payment of estimated taxes. Lender must compare the tax data received from the IRS with the financial data or tax returns submitted with the Loan application, and relied upon in approving the Loan. Borrower must resolve any significant differences to the satisfaction of Lender and SBA. Failure to resolve differences may result in cancellation of the Loan.

If the Loan involves a change of ownership, Lender must verify financial information provided by the seller of the business in the same manner as above.

If the IRS responds and the transcript reflects "Record not Found" for any tax year, Lender must follow the procedures detailed in SOP 50 10 to determine what steps must be taken to satisfy the SBA tax verification requirement.

If Lender is processing a loan under its delegated authority and does not receive a response from the IRS or copy of the tax transcript within 10 business days of submitting the IRS Form 4506-T, then Lender may close and disburse the loan provided that Lender sends a second request following precisely the procedures detailed in SOP 50 10 and Lender performs the verification and resolves any significant differences discovered, even if the Loan is fully disbursed.

b. **Authority to Conduct Business**--Evidence that Borrower and Operating Company have an Employer Identification Number and all insurance, licenses, permits and other approvals necessary to lawfully operate the business, including, but not limited to, the ability to operate at the business location.

c. **Flood Hazard Determination**--A completed Standard Flood Hazard Determination (FEMA Form 086-0-32).

d. **Lease**--Current lease(s) on all business premises where collateral is located with term, including options, at least as long as the term of the Loan.

## 4. Injection

Lender must obtain evidence that prior to disbursement:

a. **Cash Injection**--At least **$11,000.00** cash has been injected into the project. This cash is for **Paid Receipts for Inventory, Furniture & Fixtures.** The source of the cash is **Personal.**

## 5. Certifications and Agreements

a. Prior to disbursement, Lender must require Borrower and Operating Company to certify that:

(1) **Receipt of Authorization**--Borrower and Operating Company have received a copy of this Authorization from Lender, and acknowledge that

(a) The Authorization is <u>not</u> a commitment by Lender to make a loan to Borrower;

(b) The Authorization is between Lender and SBA and creates no third party rights or benefits to Borrower;

(c) The Note will require Borrower to give Lender prior notice of intent to prepay.

(d) If Borrower defaults on Loan, SBA may be required to pay Lender under the SBA guarantee. SBA may then seek recovery of these funds from Borrower. Under SBA regulations, 13 CFR Part 101, Borrower may not claim



or assert against SBA any immunities or defenses available under local law to defeat, modify or otherwise limit Borrower's obligation to repay to SBA any funds advanced by Lender to Borrower.

   (e) Payments by SBA to Lender under SBA's guarantee will not apply to the Loan account of Borrower, or diminish the indebtedness of Borrower under the Note or the obligations of any personal guarantor of the Note.

   (f) If the small business defaults on the SBA-guaranteed loan and SBA suffers a loss, the names of the small business and the guarantors of the SBA-guaranteed loan will be referred for listing in the Credit Alert Verification Reporting System (CAIVRS) database, which may affect their eligibility for further financial assistance.

(2) There has been no adverse change in Borrower's (and Operating Company's) financial condition, organization, operations, or fixed assets since the date the Loan application was signed.

(3) **Child Support**--No principal who owns at least 50% of the ownership or voting interest of the company is delinquent more than 60 days under the terms of any (a) administrative order, (b) court order, or (c) repayment agreement requiring payment of child support.

(4) **Current Taxes**-- Borrower and Operating Company are current (or will be current with any loan proceeds specified for eligible tax payments) on all federal, state, and local taxes, including but not limited to income taxes, payroll taxes, real estate taxes, and sales taxes.

(5) **Environmental**--For any real estate pledged as collateral for the Loan or where the Borrower and Operating Company (if applicable) is conducting business operations (collectively "the Property"):

   (a) At the time Borrower and Operating Company submitted the Loan application, Borrower was in compliance with all local, state, and federal environmental laws and regulations pertaining to reporting or clean-up of any hazardous substance, hazardous waste, petroleum product, or any other pollutant regulated by state or federal law as hazardous to the environment (Contaminant), and regarding any permits needed for the creation, storage, transportation or disposal of any Contaminant;

   (b) Borrower and Operating Company will continue to comply with these laws and regulations;

   (c) Borrower and Operating Company, and all of its principals, have no knowledge of the actual or potential existence of any Contaminant that exists on, at, or under the Property, including groundwater under such Property other than what was disclosed in connection with the Environmental Investigation of the Property;

   (d) Until full repayment of the Loan, Borrower and Operating Company will promptly notify Lender and SBA if it knows or suspects that there has been, or may have been, a release of a Contaminant in, at, or under the Property, including groundwater, or if Borrower and Operating Company or such Property are subject to any investigation or enforcement action by any federal, state, or local environmental agency (Agency) pertaining to any Contaminant on, at, or under such Property, including groundwater.

   (e) As to any Property owned by Borrower and Operating Company, Borrower and Operating Company indemnifies, and agrees to defend and hold harmless, Lender and SBA, and any assigns or successors in interest which take title to the Property, from and against all liabilities, damages, fees, penalties or losses arising out of any demand, claim or suit by any Agency or any other party relating to any Contaminant found on, at or under the Property, including groundwater, regardless of whether such Contaminant resulted from Borrower's or Operating Company's operations. (Lender or SBA may require Borrower and Operating Company to execute a separate indemnification agreement).

b. Prior to disbursement, Lender must require Borrower and Operating Company to certify that they will:

(1) **Reimbursable Expenses**--Reimburse Lender for expenses incurred in the making and administration of the Loan.

(2) **Books, Records and Reports**-

   (a) Keep proper books of account in a manner satisfactory to Lender ;

   (b) Furnish **Reviewed** year-end statements to Lender within **180** days of fiscal year end;

   (c) Furnish additional financial statements or reports whenever Lender requests them;

   (d) Allow Lender or SBA, at Borrower's or Operating Company's expense, to:

      [1] Inspect and audit books, records and papers relating to Borrower's and Operating Company's financial or business condition; and

      [2] Inspect and appraise any of Borrower's and Operating Company's assets; and

      [3] Allow all government authorities to furnish reports of examinations, or any records pertaining to Borrower and Operating Company, upon request by Lender or SBA.

---

SBA Loan Number: 8868978207
SBA Loan Name: MEADOWLARK OUTFITTERS LLC





(3) **Equal Opportunity**--Post SBA Form 722, Equal Opportunity Poster, where it is clearly visible to employees, applicants for employment and the general public.

(4) **American-made Products**--To the extent practicable, purchase only American-made equipment and products with the proceeds of the Loan.

(5) **Taxes**--Pay all federal, state, and local taxes, including income, payroll, real estate and sales taxes of the business when they come due.

(6) **Leasing**--During the life of the loan, the real estate pledged as Collateral for the Loan or where the Borrower or Operating Company conducts its business operations will not be leased to or occupied by any business that Borrower or Operating Company knows is engaged in any activity that is illegal under federal, state or local law or any activity that can reasonably be determined to support or facilitate any activity that is illegal under federal, state, or local law.

c. Lender must require Borrower and Operating Company to certify that they will not, without Lender's prior written consent:

(1) **Distributions**--Make any distribution of company assets that will adversely affect the financial condition of Borrower and/or Operating Company.

(2) **Ownership Changes**--Change the ownership structure or interests in the business during the term of the Loan.

(3) **Transfer of Assets**--Sell, lease, pledge, encumber (except by purchase money liens on property acquired after the date of the Note), or otherwise dispose of any of Borrower's property or assets, except in the ordinary course of business.

10-29-2020
_____
Date

A Preferred Lender, as Lender and as an agent of and on behalf of the SBA for the purpose of executing this Authorization.




Court Document   Not an Official Court Document   Not an Official Court Document   Not an O

# Modification to Authorization

Official Court Document   Not an Official Court Document   Not an Official Court Document

| SBA Loan # | 8868978207 |
|---|---|
| SBA Loan Name | Meadowlark Outfitters LLC |
| Approval Date | October 28, 2020 |
| Modification Date | February 17, 2021 |

NOW:

**G. USE OF PROCEEDS**
1. $629.00 to pay the guarantee fee (Lender may not disburse Loan proceeds solely to pay the guarantee fee).
2. $12,000.00 to purchase equipment.
3. $20,000.00 to purchase inventory.
4. $3,960.00 for working capital.
5. $411.00 Packaging and Other Closing Fees

Modify to:

**G. USE OF PROCEEDS**
1. $629.00 to pay the guarantee fee (Lender may not disburse Loan proceeds solely to pay the guarantee fee).
2. $11,905.77 to purchase equipment.
3. $19,832.02 to purchase inventory.
4. $29,222.71 for working capital.
5. $410.50 Packaging and Other Closing Fees

**ADMINISTRATOR**
**SMALL BUSINESS ADMINISTRATION**

02/17/2021
Date

A Preferred Lender, as Lender and as an agent of and on behalf of the SBA for the purpose of executing this Authorization.



Court Document    Not an Official Court Document    Not an Official Court Document    Not an O

# Modification to Authorization

Official Court Document    Not an Official Court Document    Not an Official Court Document

| SBA Loan # | 8868978207 |
|---|---|
| SBA Loan Name | Meadowlark Outfitters LLC |
| Approval Date | October 28, 2020 |
| Modification Date | March 15, 2022 |

**Current:**

**G. USE OF PROCEEDS**
1. $629.00 to pay the guarantee fee (Lender may not disburse Loan proceeds solely to pay the guarantee fee).
2. $11,905.77 to purchase equipment.
3. $19,832.02 to purchase inventory.
4. $29,222.71 for working capital.
5. $410.50 Packaging and Other Closing Fees

**I. 4. Injection**
   a. Cash Injection-At least $11,000.00 cash has been injected into the project. This cash is for Paid Receipts for Inventory, Furniture & Fixtures. The source of the cash is Personal.

**Modify to:**

**G. USE OF PROCEEDS**
1. $629.00 to pay the guarantee fee (Lender may not disburse Loan proceeds solely to pay the guarantee fee).
2. $26,905.77 to purchase equipment.
3. $89,432.02 to purchase inventory.
4. $32,404.21 for working capital.
5. $429 Packaging and Other Closing Fees

**I. 4. Injection**
   a. Cash Injection-At least $20,800 cash has been injected into the project. This cash is for Paid Receipts for Inventory, Furniture & Fixtures, and Permanent Working Capital Needs. The source of the cash is Personal.

**Reason for Modification:**

To help finance additional equipment and inventory

**ADMINISTRATOR**

03/15/2022

Date

A Preferred Lender, as Lender and as an agent of and on behalf of the SBA for the purpose of executing this Authorization.



Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM

# ASSIGNMENT

## U.S. Small Business Administration

FOR VALUE RECEIVED, in accordance with SBA Form 750 executed by
Name of Lender: THE BANK OF MISSOURI

("Lender" or "Assignor"), and in accordance with Loan Program Requirements, as that term is defined in 13 C.F.R. Part 120, Lender assigns, grants, conveys and transfers to the Assignee, the U.S. Small Business Administration ("SBA"), all right, title and interest in and to SBA 7(a) Loan Number: 8868978207 made to Name of Borrower: MEADOWLARK OUTFITTERS LLC on Date: 10/29/2020 including all Loan Documents, Loan Instruments, and any associated security instruments, mortgages or deeds of trust (the "Loan"). *See attached addendum.

Assignor authorizes the United States of America on behalf of the SBA to ask, demand, receive, collect, sue and take all lawful actions for recovery of the moneys due or to become due on this Loan, and further that the United States of America on behalf of the SBA may avail itself of its remedies under 31 U.S.C. § 3701, *et seq.*, and/or any other remedies available at law or equity for collection of the Loan and the claim or debt evidenced by the Loan.

Assignor has not done and will not do anything to hinder or prevent the United States of America on behalf of the SBA from enforcing recovery on this Loan. Assignor agrees to timely execute such other documents as are requested by SBA to effectuate recordation or as otherwise requested by SBA to assist it in collection of the Loan. In the event that after the date hereof, Assignor receives any payment or any value of any kind with respect to the Loan or obligations secured or evidenced thereby, Assignor shall hold the same in trust for Assignee and shall immediately deliver the guaranteed share to Assignee. The Assignor agrees that SBA reserves all rights and authority under 13 C.F.R. Part 120, including without limitation under 13 C.F.R. § 120.524. This Assignment shall be interpreted and construed under federal law.

The Assignor's address is:

Lender Name: THE BANK OF MISSOURI
Address: 495 S SPRINGFIELD AVE
City: BOLIVAR
State: MISSOURI
Zip: 65613



Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM

The Assignee address is: United States of America, Small Business Administration,
(Please mark the applicable address)

☐ National Guaranty Purchase Center (NGPC)
   1145 Herndon Parkway Suite 900
   Herndon, VA 20170

☐ Commercial Loan Service Center (CLSC) - AR
   2120 Riverfront Drive Suite 100
   Little Rock, AR 72202

☑ Commercial Loan Service Center (CLSC) - CA
   801 R Street Suite 101
   Fresno, CA 93721

In witness whereof, Lender, through its authorized representative and officer listed below, has executed this instrument on Date: 01/03/2024

Name of Lender: THE BANK OF MISSOURI

BY: _____
    [Signature of Authorized Representative]

Print Name/Title: MANDY VOTE
Address: 495 S SPRINGFIELD AVE
City: BOLIVAR
State: MO
Zip Code: 65613

Certificate of Acknowledgement

City/County of _____ )
                            )
State of _____        ) to wit:

On the 3RD day of JANUARY, 20 24, before me in the aforesaid jurisdiction, a Notary Public in and for the said jurisdiction, personally appeared MANDY VOTE, the AUTHORIZED REPRESENTATIVE for THE BANK OF MISSOURI who is known to me personally (or satisfactorily proven to me) to be the person whose name is subscribed to within instrument and acknowledged that he/she executed the same for the purposes and in the capacity therein contained.

_____
Notary Public

Shelly L. Simmons
Printed Name

Notary No.: 1254 1718

My Commission Expires: 8-29-2024

Stamp/Seal:

SHELLY L. SIMMONS
Notary Public - Notary Seal
STATE OF MISSOURI
Polk County
My Commission Expires: August 29, 2024
Commission #12541718





U.S. Small Business Administration

# NOTE

| | |
|---|---|
| SBA Loan # | 8868978207 |
| SBA Loan Name | MEADOWLARK OUTFITTERS LLC |
| Date | 10-29-2020 |
| Loan Amount | $37,000.00 |
| Interest Rate | Variable |
| Borrower | MEADOWLARK OUTFITTERS LLC |
| Operating Company | N/A |
| Lender | The Bank of Missouri |

**1. PROMISE TO PAY:**

In return for the Loan, Borrower promises to pay to the order of Lender the amount of **Thirty-seven Thousand and 00/100 Dollars**, interest on the unpaid principal balance, and all other amounts required by this Note.

**2. DEFINITIONS:**

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

"Guarantor" means each person or entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

**3. PAYMENT TERMS:**

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

The interest rate on this Note will fluctuate. The initial interest rate is **6.50%** per year. This initial rate is the Prime Rate in effect on the first business day of the month in which SBA received the loan application, plus **3.25%**. The initial interest rate must remain in effect until the first change period begins unless changed in accordance with SOP 50 10.

Borrower must pay a total of 3 payments of interest only on the disbursed principal balance beginning two months from the month this Note is dated and every month thereafter; payments must be made on the **fifth calendar day** in the months they are due.

Borrower must pay principal and interest payments of **$629.03** every month beginning **five** months from the month this Note is dated; payments must be made on the **fifth calendar day** in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

The interest rate will be adjusted **every calendar quarter** (the "change period"), beginning **January 1, 2021** (date of first rate adjustment).

The "Prime Rate" is the Prime Rate in effect on the first business day of the month (as published in **The Wall Street Journal** newspaper ) in which SBA received the application, or the first day of the month in which any interest rate change occurs. Base Rates will be rounded to two decimal places with .004 being rounded down and .005 being rounded up.

The adjusted interest rate will be **3.25%** above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

The interest rate identified in the Note may not be changed during the life of the Loan unless changed in accordance with SOP 50 10.

SBA Form 147 (06/03/02) Version 4.1    Page 1/3



The interest rate adjustment period may only be changed in accordance with SOP 50 10.

Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

**Loan Prepayment:**

Notwithstanding any provision in this Note to the contrary:

> **Borrower may prepay this Note.** Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:
>
> a. Give Lender written notice;
>
> b. Pay all accrued interest; and
>
> c. If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.
>
> If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

All remaining principal and accrued interest is due and payable 6 years and 3 months from date of Note.

**Late Charge:** If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to **5.00%** of the unpaid portion of the regularly scheduled payment.

**4. DEFAULT:** Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A. Fails to do anything required by this Note and other Loan Documents;

B. Defaults on any other loan with Lender;

C. Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;

D. Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;

E. Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;

F. Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;

G. Fails to pay any taxes when due

H. Becomes the subject of a proceeding under any bankruptcy or insolvency law;

I. Has a receiver or liquidator appointed for any part of their business or property;

J. Makes an assignment for the benefit of creditors;

K. Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;

L. Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or

M. Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.

**5. LENDER'S RIGHTS IF THERE IS A DEFAULT:** Without notice or demand and without giving up any of its rights, Lender may:

A. Require immediate payment of all amounts owing under this Note;

B. Collect all amounts owing from any Borrower or Guarantor;

C. File suit and obtain judgment;

D. Take possession of any Collateral; or

E. Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

**6. LENDER'S GENERAL POWERS:** Without notice and without Borrower's consent, Lender may:

A. Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;

B. Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;

C. Release anyone obligated to pay this Note;

D. Compromise, release, renew, extend or substitute any of the Collateral; and

E. Take any action necessary to protect the Collateral or collect amounts owing on this Note.



Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM

**7. WHEN FEDERAL LAW APPLIES:** When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

**8. SUCCESSORS AND ASSIGNS:** Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

**9. GENERAL PROVISIONS:**

    A.  All individuals and entities signing this Note are jointly and severally liable.

    B.  Borrower waives all suretyship defenses.

    C.  Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

    D.  Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

    E.  Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

    F.  If any part of this Note is unenforceable, all other parts remain in effect.

    G.  To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

**10. STATE-SPECIFIC PROVISIONS:**

Oral or unexecuted agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt including promises to extend or renew such debt are not enforceable, regardless of the legal theory upon which it is based that is in any way related to the credit agreement. To protect you (Borrower(s)) and us (Creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.

**11. BORROWER'S NAME(S) AND SIGNATURE(S):**

By signing below, each individual or entity becomes obligated under this Note as Borrower.

**BORROWER:**

MEADOWLARK OUTFITTERS LLC

By _____

MICHAEL S MULLETT, Member of
MEADOWLARK OUTFITTERS LLC





**\*000000000M-172169%0980%01052021% MAC1887\*\***

ORIGINAL

## THE BANK OF MISSOURI

### CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $62,000.00 | 01-05-2021 | 01-29-2031 | M-172169 | 4A / 100 | MAC1887 | DZORN | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** MEADOWLARK OUTFITTERS LLC
510 COURT ST
FULTON, MO 65251-1302

**Lender:** The Bank of Missouri
Branch 10
3610 Buttonwood Drive, Suite 100
Columbia, MO 65201

**Principal Amount: $62,000.00**     **Date of Agreement: January 5, 2021**

**DESCRIPTION OF EXISTING INDEBTEDNESS.** U.S. Small Business Administration Note dated October 29, 2020 in the original amount of $37,000.00.

**DESCRIPTION OF COLLATERAL.** See Collateral Paragraph below.

**DESCRIPTION OF CHANGE IN TERMS.** Extend Maturity Date to January 29, 2031. See Promise to Pay, Payment, Variable Interest Rate, Interest Calculation Method and Late Charge Paragraphs below.

**PROMISE TO PAY.** MEADOWLARK OUTFITTERS LLC ("Borrower") promises to pay to The Bank of Missouri ("Lender"), or order, in lawful money of the United States of America, the principal amount of Sixty-two Thousand & 00/100 Dollars ($62,000.00), together with interest on the unpaid principal balance from January 5, 2021, until paid in full.

**PAYMENT.** Subject to any payment changes resulting from changes in the index, Borrower will pay this loan in accordance with the following payment schedule, which calculates interest on the unpaid principal balance as described in the "INTEREST CALCULATION METHOD" paragraph using the interest rates described in this paragraph: 3 monthly consecutive interest payments, beginning February 8, 2021, with interest calculated on the unpaid principal balances using an interest rate based on the Prime Rate as published in the Wall Street Journal (currently 3.250%), plus a margin of 2.750 percentage points, resulting in an initial interest rate of 6.000% per annum; 116 monthly consecutive principal and interest payments in the initial amount of $701.35 each, beginning May 8, 2021, with interest calculated on the unpaid principal balances using an interest rate based on the Prime Rate as published in the Wall Street Journal (currently 3.250%), plus a margin of 2.750 percentage points, resulting in an initial interest rate of 6.000% per annum; and one principal and interest payment of $704.44 on January 29, 2031, with interest calculated on the unpaid principal balances using an interest rate based on the Prime Rate as published in the Wall Street Journal (currently 3.250%), plus a margin of 2.750 percentage points, resulting in an initial interest rate of 6.000% per annum. This estimated final payment is based on the assumption that all payments will be made exactly as scheduled and that the index does not change; the actual final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts on this loan. Unless otherwise agreed or required by applicable law, payments will be applied first to any unpaid collection costs; then to any late charges; then to any accrued unpaid interest; and then to principal. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this loan is subject to change from time to time based on changes in an independent index which is the Prime Rate as published in the Wall Street Journal (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If Lender determines, in its sole discretion, that the Index for this loan has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this loan, Lender may amend this loan by designating a substantially similar substitute index. Lender may also amend and adjust any margin corresponding to the Index being substituted to accompany the substitute index. Margins corresponding to the Index are described in the "Payments" section. The change to the margin may be a positive or negative value, or zero, in making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific index that is unavailable or unreliable. Such an amendment to the terms of this loan will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. Lender will tell Borrower the current index rate upon Borrower's request. The interest rate change will not occur more often than each first day of each calendar quarter. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 3.250% per annum. The interest rate or rates to be applied to the unpaid principal balance during this loan will be the rate or rates set forth herein in the "Payment" section. Notwithstanding any other provision of this Agreement, after the first payment stream, the interest rate for each subsequent payment stream will be effective as of the due date of the last payment in the just-ending payment stream. NOTICE: Under no circumstances will the interest rate on this loan be more than the maximum rate allowed by applicable law. Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following: (A) increase Borrower's payments to ensure Borrower's loan will pay off by its original final maturity date, (B) increase Borrower's payments to cover accruing interest, (C) increase the number of Borrower's payments, and (D) continue Borrower's payments at the same amount and increase Borrower's final payment.

**INTEREST CALCULATION METHOD.** Interest on this loan is computed on a 365/365 simple interest basis; that is, by applying the ratio of the interest rate over the number of days in a year (366 for all years, including leap years), multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this loan is computed using this method.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: The Bank of Missouri, PO Box 309 Perryville, MO 63775-0309.

**LATE CHARGE.** If a payment is more than 10 days late, Borrower will be charged 5.000% of the unpaid portion of the regularly scheduled payment or $25.00, whichever is greater.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this loan shall be increased by adding an additional 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. After maturity, or after this loan would have matured had there been no default, the Default Rate Margin will continue to apply to the final interest rate described in this Agreement. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Agreement within the preceding one (1) month, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Agreement and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**COLLATERAL.** Borrower acknowledges this Agreement is secured by:

(A) Commercial Security Agreement dated October 29, 2020 executed by Meadowark Outfitters LLC

(B) Assignment of Life Insurance on Michael S Mullett.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Agreement if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Missouri.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $25.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**LINE OF CREDIT.** This Note evidences a straight line of credit. Once the total amount of Principal has been advanced, Borrower is not entitled to further loan advances. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized, except as provided in this paragraph, to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: Michael S Mullett, Manager of Meadowlark Outfitters LLC. Minimum advance authority is $1,000.00. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**PRIOR NOTE.** U.S. Small Business Administration Note dated October 29, 2020 in the original amount of $37,000.00.

**SUCCESSORS AND ASSIGNS.** Subject to any limitations stated in this Agreement on transfer of Borrower's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Borrower, Lender, without notice to Borrower, may deal with Borrower's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Borrower from the obligations of this Agreement or liability under the Indebtedness.

**MISCELLANEOUS PROVISIONS.** If any part of this Agreement cannot be enforced, this fact will not affect the rest of the Agreement. Lender may delay or forgo enforcing any of its rights or remedies under this Agreement without losing them. Borrower and any other person who signs, guarantees or endorses this Agreement, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, no party who signs this Agreement, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Agreement are joint and several.

**ORAL OR UNEXECUTED AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.**



PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

MEADOWLARK OUTFITTERS LLC

By: _____
MICHAEL S MULLETT, Member of MEADOWLARK
OUTFITTERS LLC

LENDER:

THE BANK OF MISSOURI

X _____
Andrew Zorn, DBA Lender

LaserPro, Ver. 20.3.10.004, Copr. Finastra USA Corporation 1997-2021. All Rights Reserved. - MO E:\CFI\LPL\D20C.FC TR-14844 PR-138

Not an Official Court Document

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM



*00000000000M-172169%0960%03162022% MAC1667*



## THE BANK OF MISSOURI

### CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $147,114.78 | 03-15-2022 | 01-29-2031 | M-172169 | 4A / 100 | MAC1667 | DZORN | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** MEADOWLARK OUTFITTERS LLC
510 E 3RD ST
FULTON, MO 66251-0000

**Lender:** The Bank of Missouri
Branch 10
3610 Buttonwood Drive, Suite 100
Columbia, MO 65201

**Principal Amount:** $147,114.78                **Date of Agreement:** March 15, 2022

**DESCRIPTION OF EXISTING INDEBTEDNESS.** U.S. Small Business Administration Note dated October 29, 2020.

**DESCRIPTION OF COLLATERAL.** See Collateral Paragraph below.

**DESCRIPTION OF CHANGE IN TERMS.** Extend Maturity Date to January 29, 2031. I will pay this loan in accordance with the following payment schedule. 3 monthly consecutive interest only payments beginning with the April 5, 2022 payment. See Promise to Pay, Payment, Variable Interest Rate, Interest Calculation Method and Late Charge paragraphs below.

**PROMISE TO PAY.** MEADOWLARK OUTFITTERS LLC ("Borrower") promises to pay to The Bank of Missouri ("Lender"), or order, in lawful money of the United States of America, the principal amount of One Hundred Forty-seven Thousand One Hundred Fourteen & 78/100 Dollars ($147,114.78), together with interest on the unpaid principal balance from March 15, 2022, until paid in full.

**PAYMENT.** Subject to any payment changes resulting from changes in the Index, Borrower will pay this loan in accordance with the following payment schedule, which calculates interest on the unpaid principal balances as described in the "INTEREST CALCULATION METHOD" paragraph using the interest rates described in this paragraph. 3 monthly consecutive interest only payments, beginning April 5, 2022, with interest calculated on the unpaid principal balances using an interest rate based on the Prime Rate as published in the Wall Street Journal, (currently 3.250%), plus a margin of 3.250 percentage points, resulting in an initial interest rate of 6.500% per annum; 102 monthly consecutive principal and interest payments in the initial amount of $1,867.30 each, beginning July 5, 2022, with interest calculated on the unpaid principal balances using an interest rate based on the Prime Rate as published in the Wall Street Journal, (currently 3.250%), plus a margin of 3.250 percentage points, resulting in an initial interest rate of 6.500% per annum; and one principal and interest payment of $1,873.05 on January 29, 2031, with interest calculated on the unpaid principal balances using an interest rate based on the Prime Rate as published in the Wall Street Journal, (currently 3.250%), plus a margin of 3.250 percentage points, resulting in an initial interest rate of 6.500% per annum. This estimated final payment is based on the assumption that all payments will be made exactly as scheduled and that the loan does not change; the actual final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts on this loan. Unless otherwise agreed or required by applicable law, payments will be applied first to any unpaid collection costs; then to any late charges; then to any accrued unpaid interest; and then to principal. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this loan is subject to change from time to time based on changes in an independent index which is the Prime Rate as published in the Wall Street Journal (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If Lender determines, in its sole discretion, that the Index for this loan has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this loan, Lender may amend this loan by designating a substantially similar substitute index. Lender may also amend and adjust any margin corresponding to the Index being substituted to accompany the substitute index. Margins corresponding to the Index are described in the "Payments" section. The change to the margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific index that is unavailable or unreliable. Such an amendment to the terms of this loan will become effective and bind Borrower 15 business days after Lender gives written notice to Borrower without any action or consent of Borrower. Lender will tell Borrower the current index rate upon Borrower's request. The interest rate change will not occur more often than each first day of each calendar quarter. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 3.250% per annum. The interest rate or rates to be applied to the unpaid principal balance during this loan will be the rate or rates set forth herein in the "Payment" section. Notwithstanding any other provision of this Agreement, after the first payment stream, the interest rate for each subsequent payment stream will be effective as of the due date of the last payment in the just-ending payment stream. NOTICE: Under no circumstances will the interest rate on this loan be more than the maximum rate allowed by applicable law. Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following: (A) increase Borrower's payments to ensure Borrower's loan will pay off by its original final maturity date, (B) increase Borrower's payments to cover accruing interest, (C) increase the number of Borrower's payments, and (D) continue Borrower's payments at the same amount and increase Borrower's final payment.

**INTEREST CALCULATION METHOD.** Interest on this loan is computed on a 365/365 simple interest basis; that is, by applying the ratio of the interest rate over the number of days in a year (365 for all years, including leap years), multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this loan is computed using this method.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment is "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: The Bank of Missouri, PO Box 309 Perryville, MO 63775-0309.

**LATE CHARGE.** If a payment is more than 10 days late, Borrower will be charged 5.000% of the unpaid portion of the regularly scheduled payment or $25.00, whichever is greater.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this loan shall be increased by adding an additional 6.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. After maturity, or after this loan would have matured had there been no default, the Default Rate Margin will continue to apply to the final interest rate described in this Agreement. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes



false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Agreement within the preceding one (1) month, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Agreement and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**COLLATERAL.** Borrower acknowledges this Agreement is secured by

A) Commercial Security Agreement dated October 29, 2020 executed by Meadowlark Outfitters LLC

B) Assignment of Life Insurance Policy as Collateral on Michael S Mullett.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Agreement if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Missouri.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $25.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**LINE OF CREDIT.** This Note evidences a straight line of credit. Once the total amount of Principal has been advanced, Borrower is not entitled to further loan advances. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized, except as provided in this paragraph, to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: MICHAEL S MULLETT, Member of MEADOWLARK OUTFITTERS LLC. Minimum advance authority is $1,000.00. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**PRIOR NOTE.** U.S. Small Business Administration Note dated October 29, 2020.

**SUCCESSORS AND ASSIGNS.** Subject to any limitations stated in this Agreement on transfer of Borrower's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Borrower, Lender, without notice to Borrower, may deal with Borrower's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Borrower from the obligations of this Agreement or liability under the Indebtedness.

**MISCELLANEOUS PROVISIONS.** If any part of this Agreement cannot be enforced, this fact will not affect the rest of the Agreement. Lender may delay or forgo enforcing any of its rights or remedies under this Agreement without losing them. Borrower and any other person who signs, guarantees or endorses this Agreement, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, no party who signs this Agreement, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Agreement are joint and several.

ORAL OR UNEXECUTED AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM



# CHANGE IN TERMS AGREEMENT
## (Continued)

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

MEADOWLARK OUTFITTERS LLC

By: _____
MICHAEL S. MULLETT, Member of MEADOWLARK
OUTFITTERS LLC

LENDER:

THE BANK OF MISSOURI

X _____
Andrew Zorn, Vp, Senior SBA Loan Officer

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM



U.S. Small Business Administration
Lender's Transcript of Account

Borrower: MEADOWLARK OUTFITTERS LLC                                    Loan Number:    8868978207          Page    1
Lender : THE BANK OF MISSOURI              Loan Amount:    149,800.00 Basis:    365
Bank Loan#    172169

Repayment Terms as Stated in the Note    Payment Type:  Principal and Interest
Note date:   10/29/20    Payment:     2,220.93    Interest Rate:  5.500000
Maturity date: 1/29/31    Payment Freq:  MONTHLY    Rate Change:   QUARTERLY

| Date | Amount Disbursed | Amount Repaid | Deferment | Application of Payment Principal | Interest | Interest Rate | Interest Paid From | To | Principal Balance |
|------|------|------|------|------|------|------|------|------|------|
| 10/29/20 | Interest Rate Changed To: | | | 6.500000% | | | | | |
| 10/30/20 | 12,960.50 | | | | | 6.500000% | | 0/00/00 | 12,960.50 |
| 11/05/20 | 5,374.39 | | | | | 6.500000% | | 0/00/00 | 18,334.89 |
| 11/09/20 | 4,971.55 | | | | | 6.500000% | | 0/00/00 | 23,306.44 |
| 11/12/20 | 7,906.61 | | | | | 6.500000% | | 0/00/00 | 31,213.05 |
| 11/19/20 | 2,487.16 | | | | | 6.500000% | | 0/00/00 | 33,700.21 |
| 11/23/20 | 2,826.28 | | | | | 6.500000% | | 0/00/00 | 36,526.49 |
| 12/07/20 | | 177.41 | | 0.00 | 177.41 | 6.500000% | 10/30/20 | 12/04/20 | 36,526.49 |
| 12/17/20 | 473.51 | | | | | 6.500000% | | 12/04/20 | 37,000.00 |
| 1/08/21 | | 212.20 | | 0.00 | 212.20 | 6.500000% | 12/04/20 | 1/05/21 | 37,000.00 |
| 2/03/21 | 12,000.00 | | | | | 6.500000% | | 1/05/21 | 49,000.00 |
| 2/04/21 | 4,000.00 | | | | | 6.500000% | | 1/05/21 | 53,000.00 |
| 2/05/21 | 4,000.00 | | | | | 6.500000% | | 1/05/21 | 57,000.00 |
| 2/05/21 | | 212.15- | | 0.00 | 212.15- | 6.500000% | | 1/05/21 | 57,000.00 |
| 2/05/21 | | 913.53 | | 701.38 | 212.15 | 6.500000% | 1/05/21 | 2/05/21 | 56,298.62 |
| 2/05/21 | | 701.38- | | 701.38- | 0.00 | 6.500000% | | 2/05/21 | 57,000.00 |
| 2/08/21 | | 731.88 | | 701.38 | 30.50 | 6.500000% | 2/05/21 | 2/08/21 | 56,298.62 |
| 2/08/21 | | 731.88- | | 701.38- | 30.50- | 6.500000% | | 2/08/21 | 57,000.00 |
| 2/09/21 | | 711.41 | | 701.38 | 10.03 | 6.500000% | 2/08/21 | 2/09/21 | 56,298.62 |
| 2/09/21 | | 711.41- | | 701.38- | 10.03- | 6.500000% | | 2/09/21 | 57,000.00 |
| 2/10/21 | | 711.30 | | 701.38 | 9.92 | 6.500000% | 2/09/21 | 2/10/21 | 56,298.62 |



U.S. Small Business Administration
Lender's Transcript of Account

Borrower: MEADOWLARK OUTFITTERS LLC                                    Loan Number:   8868976207
Lender  : THE BANK OF MISSOURI          Loan Amount:    149,800.00 Basis    365
Bank Loan#      172169

Repayment Terms as Stated in the Note     Payment Type:  Principal and Interest
Note date:  10/29/20     Payment:      2,220.93     Interest Rate:   6.500000
Maturity date:  1/29/31     Payment Freq:   MONTHLY     Rate Change:    QUARTERLY

| Date | Amount Disbursed | Amount Repaid | Deferment | Application of Payment Principal | Interest | Interest Rate | Interest Paid From | To | Principal Balance |
|------|------|------|------|------|------|------|------|------|------|
| 2/11/21 | | 711.30- | | 701.38- | 9.92- | 6.500000% | | 2/10/21 | 57,000.00 |
| 2/12/21 | | 207.10 | | 0.00 | 207.10 | 6.500000% | 1/08/21 | 2/06/21 | 57,000.00 |
| 2/12/21 | | 207.10 | | 130.01 | 77.09 | 6.500000% | 2/06/21 | 2/12/21 | 56,869.99 |
| 2/17/21 | 3,000.00 | | | | | 6.500000% | | 2/12/21 | 59,869.99 |
| 3/05/21 | | 224.30 | | 0.00 | 224.30 | 6.500000% | 2/12/21 | 3/05/21 | 59,869.99 |
| 3/05/21 | 2,000.00 | | | | | 6.500000% | | 3/05/21 | 61,869.99 |
| 5/27/21 | | 344.50 | | 0.00 | 344.50 | 6.500000% | 3/05/21 | 4/05/21 | 61,869.99 |
| 5/27/21 | | 335.13 | | 0.00 | 335.13 | 6.500000% | 4/05/21 | 5/05/21 | 61,869.99 |
| 5/27/21 | | 21.75 | | 0.00 | 21.75 | 6.500000% | 5/05/21 | 5/07/21 | 61,869.99 |
| 7/08/21 | | 324.55 | | 0.00 | 324.55 | 6.500000% | 5/07/21 | 6/05/21 | 61,869.99 |
| 7/07/21 | | 335.12 | | 0.00 | 335.12 | 6.500000% | 6/05/21 | 7/05/21 | 61,869.99 |
| 7/07/21 | | 41.71 | | 41.71 | 0.00 | 6.500000% | | 7/05/21 | 61,828.28 |
| 8/06/21 | | 100.00 | | 100.00 | 0.00 | 6.500000% | | 7/05/21 | 61,728.28 |
| 9/16/21 | | 346.09 | | 0.00 | 346.09 | 6.500000% | 7/05/21 | 8/05/21 | 61,728.28 |
| 9/16/21 | | 345.52 | | 0.00 | 345.52 | 6.500000% | 8/05/21 | 9/05/21 | 61,728.28 |
| 9/16/21 | | 9.77 | | 9.77 | 0.00 | 6.500000% | | 9/05/21 | 61,718.51 |
| 11/04/21 | | 736.71 | | 68.07 | 668.64 | 6.500000% | 9/05/21 | 11/04/21 | 61,650.44 |
| 11/04/21 | | 334.33 | | 334.33 | 0.00 | 6.500000% | | 11/04/21 | 61,316.11 |
| 11/29/21 | | 736.71 | | 459.94 | 276.77 | 6.500000% | 11/04/21 | 11/29/21 | 60,856.17 |
| 1/05/22 | | 736.71 | | 330.15 | 406.56 | 6.500000% | 11/29/21 | 1/05/22 | 60,526.02 |
| 1/05/22 | | 402.38 | | 402.38 | 0.00 | 6.500000% | | 1/05/22 | 60,123.64 |

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM



U.S. Small Business Administration
Lender's Transcript of Account

Borrower: MEADOWLARK OUTFITTERS LLC
Lender : THE BANK OF MISSOURI            Loan Amount:        149,800.00 Basis    365        Loan Number:    8868978207        Page    3
Bank Loan#      172169

Repayment Terms as Stated in the Note    Payment Type:  Principal and Interest
Note date:   10/29/20    Payment:       2,220.93    Interest Rate:  6.500000
Maturity date: 1/29/31    Payment Freq:  MONTHLY    Rate Change:   QUARTERLY

| Date | Amount Disbursed | Amount Repaid | Deferment | Application of Payment Principal | Interest | Interest Rate | Interest Paid From | To | Principal Balance |
|------|------|------|------|------|------|------|------|------|------|
| 2/28/22 | | 735.43 | | 149.23 | 586.20 | 6.500000% | 1/05/22 | 2/28/22 | 59,974.41 |
| 3/07/22 | | 735.43 | | 659.63 | 75.80 | 6.500000% | 2/28/22 | 3/07/22 | 59,314.78 |
| 3/21/22 | 37,925.44 | | | | | 6.500000% | | 3/07/22 | 97,240.22 |
| 3/22/22 | 24,964.95 | | | | | 6.500000% | | 3/07/22 | 122,205.17 |
| 3/28/22 | 9,222.06 | | | | | 6.500000% | | 3/07/22 | 131,427.23 |
| 3/29/22 | 4,430.02 | | | | | 6.500000% | | 3/07/22 | 135,857.25 |
| 4/05/22 | | 470.90 | | 0.00 | 470.90 | 6.500000% | 3/07/22 | 4/04/22 | 135,857.25 |
| 4/06/22 | 2,081.50 | | | | | 6.500000% | | 4/04/22 | 137,938.75 |
| 4/13/22 | 4,205.24 | | | | | 6.500000% | | 4/04/22 | 142,143.99 |
| 4/20/22 | 4,970.79 | | | | | 6.500000% | | 4/04/22 | 147,114.78 |
| 4/29/22 Interest Rate Changed To: | | | 6.750000% | | | | | | |
| 5/05/22 | | 763.44 | | 0.00 | 763.44 | 6.750000% | 4/04/22 | 5/04/22 | 147,114.78 |
| 6/06/22 | | 862.37 | | 0.00 | 862.37 | 6.750000% | 5/04/22 | 6/05/22 | 147,114.78 |
| 7/07/22 | | 1,867.80 | | 997.20 | 870.60 | 6.750000% | 6/05/22 | 7/07/22 | 146,117.58 |
| 7/29/22 Interest Rate Changed To: | | | 8.750000% | | | | | | |
| 8/08/22 | | 1,867.80 | | 923.04 | 944.76 | 8.750000% | 7/07/22 | 8/08/22 | 145,194.54 |
| 9/06/22 | | 2,035.42 | | 1,026.02 | 1,009.40 | 8.750000% | 8/08/22 | 9/06/22 | 144,168.52 |
| 10/07/22 | | 2,035.42 | | 964.03 | 1,071.39 | 8.750000% | 9/06/22 | 10/07/22 | 143,204.49 |
| 10/29/22 Interest Rate Changed To: | | | 9.500000% | | | | | | |
| 11/07/22 | | 2,035.42 | | 944.72 | 1,090.70 | 9.500000% | 10/07/22 | 11/07/22 | 142,259.77 |
| 12/06/22 | | 2,091.14 | | 1,017.37 | 1,073.77 | 9.500000% | 11/07/22 | 12/06/22 | 141,242.40 |



Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM

U.S. Small Business Administration

Lender's Transcript of Account

Borrower: MEADOWLARK OUTFITTERS LLC

Lender : THE BANK OF MISSOURI

Bank Loan# 172169

| | | | | Loan Number: | 8868978207 | |
| Loan Amount: | 149,800.00 | Basis | 365 | | | Page 4 |

Repayment Terms as Stated in the Note   Payment Type: Principal and Interest

Note date: 10/29/20   Payment: 2,220.93   Interest Rate: 6.500000

Maturity date: 1/29/31   Payment Freq: MONTHLY   Rate Change: QUARTERLY

| Date | Amount Disbursed | Amount Repaid | Deferment | Application of Payment Principal | Interest | Interest Rate | Interest Paid From | To | Principal Balance |
|------|-----------------|---------------|-----------|-------------------------------|----------|---------------|-------------------|-----|-------------------|
| 1/13/23 | | 2,091.14 | | 694.19 | 1,396.95 | 9.500000% | 12/06/22 | 1/13/23 | 140,548.21 |
| 1/29/23 Interest Rate Changed To: | | | | 10.750000% | | | | | |
| 2/10/23 | | 2,091.14 | | 1,009.11 | 1,082.03 | 10.750000% | 1/13/23 | 2/10/23 | 139,539.10 |
| 3/07/23 | | 2,183.67 | | 1,156.24 | 1,027.43 | 10.750000% | 2/10/23 | 3/07/23 | 138,382.86 |
| 4/13/23 | | 2,183.67 | | 675.68 | 1,507.99 | 10.750000% | 3/07/23 | 4/13/23 | 137,707.18 |
| 4/13/23 Interest Rate Changed To: | | | | 11.250000% | | | | | |
| 5/17/23 | | 2,183.67 | | 770.76 | 1,412.91 | 11.250000% | 4/13/23 | 5/17/23 | 136,936.42 |
| 6/07/23 | | 2,220.93 | | 1,334.59 | 886.34 | 11.250000% | 5/17/23 | 6/07/23 | 135,601.83 |
| 7/13/23 Interest Rate Changed To: | | | | 11.750000% | | | | | |
| 08/29/23 | | 71,814.00 | | 71,814.00 | 0.00 | 11.750000% | | 6/07/23 | 63,787.83 |

| Totals: | 149,800.00 | 106,447.88 | | 86,012.17 | 20,435.71 | | | | |

I certify this to be a true copy of transcript of account

Mandy Vote

| Signature | Title | Date |

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM



*00000000000172169%0235%1029202020% MAC1867*

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $37,000.00 | 10-29-2020 | 01-29-2027 | 172169 | 4A / 100 | MAC1867 | DZORN | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

| Grantor: | MEADOWLARK OUTFITTERS LLC<br>510 Court St<br>Fulton, MO  65251 | Lender: | The Bank of Missouri<br>Branch 10<br>3810 Buttonwood Drive, Suite 100<br>Columbia, MO  65201 |
|----------|----------|---------|----------|

THIS COMMERCIAL SECURITY AGREEMENT dated October 29, 2020, is made and executed between MEADOWLARK OUTFITTERS LLC ("Grantor") and The Bank of Missouri ("Lender").

GRANT OF SECURITY INTEREST. For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

COLLATERAL DESCRIPTION. The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment and performance of all other obligations under the Note and this Agreement:

All Inventory, Chattel Paper, Accounts, Equipment, General Intangibles and Instruments

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

CROSS-COLLATERALIZATION. In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

FUTURE ADVANCES. In addition to the Note, this Agreement secures all future advances made by Lender to Grantor regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes.

RIGHT OF SETOFF. To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL. With respect to the Collateral, Grantor represents and promises to Lender that:

Perfection of Security Interest. Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.

Notices to Lender. Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management or in the members or managers of the limited liability company Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

No Violation. The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its membership agreement does not prohibit any term or condition of this Agreement.

Enforceability of Collateral. To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

Location of the Collateral. Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

Removal of the Collateral. Except in the ordinary course of Grantor's business, including the sales of Inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Missouri, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact



location of the Collateral.

**Transactions Involving Collateral.** Except for Inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell Inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement. Grantor will promptly notify Lender of any change to Grantor's name or the name of any individual Grantor, any individual who is a partner for a Grantor, and any individual who is a trustee or settlor or trustor for a Grantor under this Agreement. Grantor will also promptly notify Lender of any change to the name that appears on the most recently issued, unexpired driver's license or state-issued identification card, any expiration of the most recently issued driver's license or state-issued identification card for Grantor or any individual for whom Grantor is required to provide notice regarding name changes.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM

000162-29-38

00002115

Not an Official Court Document

Page 74 of 83



be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including, but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon the occurrence of any Event of Default.

**REINSTATEMENT OF SECURITY INTEREST.** If payment is made by Grantor, whether voluntarily or otherwise, or by guarantor or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment (A) to Grantor's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, (B) by reason of any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of Lender's property, or (C) by reason of any settlement or compromise of any claim made by Lender with any claimant (including without limitation Grantor), the Indebtedness shall be considered unpaid for the purpose of enforcement of this Agreement and this Agreement shall continue to be effective or shall be reinstated, as the case may be, notwithstanding any cancellation of this Agreement or of any note or other instrument or agreement evidencing the Indebtedness and the Collateral will continue to secure the amount repaid or recovered to the same extent as if that amount never had been originally received by Lender, and Grantor shall be bound by any judgment, decree, order, settlement or compromise relating to the Indebtedness or to this Agreement.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution of Grantor (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding one (1) month, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Missouri Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM

000162-30-38
00002116

remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**FUTURE ADVANCES. NOTICE,** the motor vehicle that serves as collateral on this security agreement may also serve as collateral for future advances.

**UNITED STATES SMALL BUSINESS ADMINISTRATION.** The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:

a) When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

b) Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this Instrument.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of the Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Applicable Law.** The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations: (a) When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law. (b) Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan. Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means MEADOWLARK OUTFITTERS LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM



Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means MEADOWLARK OUTFITTERS LLC.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means The Bank of Missouri, its successors and assigns.

**Note.** The word "Note" means the Note dated October 29, 2020 and executed by MEADOWLARK OUTFITTERS LLC in the principal amount of $37,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED OCTOBER 29, 2020.**

**GRANTOR:**

**MEADOWLARK OUTFITTERS LLC**

By: _____
**MICHAEL S MULLETT, Member of MEADOWLARK OUTFITTERS LLC**

LaserPro, Ver. 20.3.10.002 Copr. Finastra USA Corporation 1997, 2020. All Rights Reserved. - MO TXLASERPRO\CFI\LPL\E40.FC TR-207691 PR-120



Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM



## COMMERCIAL GUARANTY

**Borrower:** MEADOWLARK OUTFITTERS LLC
810 COURT ST
FULTON, MO 65251-1902

**Lender:** The Bank of Missouri
Branch 10
3810 Buttonwood Drive, Suite 100
Columbia, MO 65201

**Guarantor:** MICHAEL S MULLETT
321 Meadowlark Ln
Fulton, MO 65251

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means U.S. Small Business Administration Note dated October 29, 2020 in the original amount of $37,000.00.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all of the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be requested and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that: (A) no representations or agreements of any kind have been made to Guarantor which limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S FINANCIAL STATEMENTS.** Guarantor agrees to furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than ninety (90) days after the end of each fiscal year, Guarantor's balance sheet and income statement for the year ended, prepared by Guarantor in form satisfactory to Lender.

**Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Guarantor's Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

All financial reports required to be provided under this Guaranty shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Guarantor as being true and correct.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender: (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with

any other applicable provisions of the Uniform Commercial Code. (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale. (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness. (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness. (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness. (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower: provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Federal Law.** When SBA is the holder, the Note and this Guaranty will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from states or local control, penalty, tax, or liability. As to this Guaranty, Guarantor may not claim or assert any local or state law against SBA to deny any obligation, defeat any claim of SBA, or preempt federal law.

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. All of the obligations of Guarantor under this Guaranty shall be joint and several, and shall be joint and several. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Guarantor, Lender, without notice to Guarantor, may deal with Guarantor's successors with reference to this Guaranty and the Indebtedness by way of forbearance or extension without releasing Guarantor from the obligations of this Guaranty or liability under the Indebtedness. Successors and Assigns. Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, and to the extent that Lender agrees in writing, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns. If Lender's interest in any of the Indebtedness or any interest therein, this Guaranty shall be transferable to the same extent and with the same force and effect as any such indebtedness may be transferable.

000162-34-38

00002120



**NATURE OF GUARANTY.** Guarantor's liability under this Guaranty shall be open and continuous for so long as this Guaranty remains in force. Guarantor intends to guarantee at all times the performance and prompt payment when due, whether at maturity or earlier by reason of acceleration or otherwise, of all Indebtedness. Accordingly, no payments made upon the Indebtedness will discharge or diminish the continuing liability of Guarantor in connection with any remaining portions of the Indebtedness or any of the Indebtedness which subsequently arises or is thereafter incurred or contracted.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means MEADOWLARK OUTFITTERS LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation MICHAEL B MULLETT, and in each case, any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means The Bank of Missouri, its successors and assigns.

**Note.** The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

ORAL OR UNEXECUTED AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY", NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED JANUARY 8, 2021.

GUARANTOR:

X _____
MICHAEL B MULLETT

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM



Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM

"000000000M-172160%0320%010522021% MAC1867"

# COMMERCIAL GUARANTY

| | |
|---|---|
| **Borrower:** MEADOWLARK OUTFITTERS LLC<br>810 COURT ST<br>FULTON, MO 65251-1932 | **Lender:** The Bank of Missouri<br>Branch 18<br>3610 Buttonwood Drive, Suite 100<br>Columbia, MO 65201 |
| **Guarantor:** NICOLE J ELLIOTT<br>321 Meadowlark Ln<br>Fulton, MO 65251 | |

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means U.S. Small Business Administration Note dated October 20, 2020 in the original amount of $37,000.00.

**CONTINUING GUARANTY. THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS.** ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is incurred by Borrower prior to revocation, incurred under a commitment that became binding before revocation, any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest, principal amount, fees or other charges on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S FINANCIAL STATEMENTS.** Guarantor agrees to furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than ninety (90) days after the end of each fiscal year, Guarantor's balance sheet and income statement for the year ended, prepared by Guarantor in form satisfactory to Lender.

**Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Guarantor's Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

All financial reports required to be provided under this Guaranty shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Guarantor as being true and correct.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give



Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM

any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Federal Law.** When SBA is the holder, the Note and this Guaranty will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Guaranty, Guarantor may not claim or assert any local or state law against SBA to deny any obligation, defeat any claims of SBA, or preempt federal law.

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty. Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** This Guaranty shall be understood to be for the benefit of Lender and for such other person or persons as may from time to time become or be the holder or owner of any of the Indebtedness or any interest therein, and this Guaranty shall be transferable to the same extent and with the same force and effect as any such Indebtedness may be transferable.



**NATURE OF GUARANTY.** Guarantor's liability under this Guaranty shall be open and continuous for so long as the Guaranty remains in force. Guarantor intends to guarantee all at once the performance and prompt payment when due, whether at maturity or earlier by reason of acceleration or otherwise, of all Indebtedness. Accordingly, no payments made upon the Indebtedness will discharge or diminish the continuing liability of Guarantor in connection with any remaining portions of the Indebtedness or any of the Indebtedness which subsequently arises or is thereafter incurred or contracted.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means MEADOWLARK OUTFITTERS LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation NICOLE J ELLIOTT, and in each case, any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means The Bank of Missouri, its successors and assigns.

**Note.** The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

ORAL OR UNEXECUTED AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED JANUARY 5, 2021.

**GUARANTOR:**

X ~~Nicole J. Elliott~~
NICOLE J ELLIOTT

LaserPro, Ver. 20.4.10.012 Copr. Finastra USA Corporation 1997, 2021. All Rights Reserved. - MO/KS C:\Laser\CFI\LPL\E20.FC TR-2345 PR-103

Electronically Filed - CALLAWAY - April 09, 2025 - 03:44 PM

